MORRIS E. ANDERSON AND MARLENE H. ANDERSON, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROBERT K. CLAWSON AND SHIRLEY S. CLAWSON, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2761–83, 2763–83. Filed December 5, 1984.

*Wayne A. Smith* and *Scott W. Gray*, for the petitioners.
*Bernard Oster, Terence D. Woolston,* and *Fera Wagner,* for the respondent.

COHEN, *Judge*: Respondent determined deficiencies as follows:

| Petitioners | Docket No. | Year ended | Deficiency |
|---|---|---|---|
| Morris E. and Marlene H. Anderson | 2761–83 | 1978 | $32,598 |
| Robert K. and Shirley S. Clawson | 2763–83 | 1978 | 32,226 |

The primary issue for decision is whether amounts paid to Einar C. Erickson, a consulting geologist, allegedly for mining development expenses, are deductible under section 616.[1] Petitioners contend that the expenses related to a joint venture among themselves, Erickson, and Erickson's company for development of the Diamond Mine.

A secondary issue is whether petitioners in related cases[2] may be relieved of their stipulation to be bound by the result in this case.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation is incorporated herein by this reference. Petitioners were residents of Salt Lake City, UT, at the time of filing their petitions herein. Petitioners Morris E. Anderson and Robert K. Clawson (petitioners) entered into the transactions about which the dispute in this proceeding arises. Petitioners Marlene H. Anderson and Shirley S. Clawson are the wives of petitioners

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue.

[2] Gennaro Licosati and Margaret Licosati, docket No. 13707–81; Roger D. Follett and Norma S. Follett, docket No. 25752–81; Donald M. Taylor and Kathleen G. Taylor, docket No. 761–82; Dayton W. Adams and Shelley A. Adams, docket No. 922–82; Gene Hutchins and Barbara Hutchins, docket No. 8487–82; Benton Ledbetter and Karen A. Ledbetter, docket No. 9052–82; Michael L. Krom and Julia P. Krom, docket No. 9053–82; Patrick T. Conner and Ashley G. Conner, docket No. 9054–82; John W. Curtin and Constance Curtin, docket No. 9588–82; Dennis A. Rierson, docket No. 10885–82; John Henry Ragland and Brigid R. Ragland, docket No. 10888–82; Wayne A. Smith, docket No. 12399–89; Donald C. Lamberson and Beulah M. Lamberson, docket No. 15773–82; and Andrew J. Kacic and Kim M. Kacic, docket No. 174–83.

and are parties to this proceeding only because they filed joint returns for 1978 with their husbands.

## 1. Operative Facts

In 1978, Einar C. Erickson (Erickson) and the Silver Viking Corp. (Silver Viking) offered for sale approximately 35 investment units, at $100,000 per unit, in an activity designated as the "Diamond Mine Project." The Diamond Mine Project was to be located in Eureka County, NV.

The offering memorandum for the Diamond Mine Project, dated November 20, 1978, set forth a series of contractual arrangements between Erickson, Silver Viking, and prospective purchasers of the investment units. Under these arrangements, purchasers of a unit would sign a development agreement with Erickson and execute a mining contract with Silver Viking by its president, Erickson; the consideration to be given by each purchaser was $20,000 in cash and a nonrecourse note for $80,000 in favor of Erickson.

In a section entitled "Federal Income Tax Consequences," the offering memorandum referred to and incorporated an opinion provided by the firm of Lane & Smith, Ltd., identified as "counsel for Erickson," attached to the memorandum. Petitioners' trial attorney in this proceeding was a member of that firm. Both the offering memorandum and the attached opinion of counsel discussed various tax issues, including the qualification of the expenditures for deduction under section 616; the correct year for deduction of the expenditures paid in cash and evidenced by the promissory note; capital gains treatment on disposition of the mining claims; depletion; and the consequences of foreclosure on the notes. In addition, the offering memorandum contained the following paragraph:

### Joint Venture or Partnership

Tax counsel is of the opinion that the documents and instruments evidencing the relationship between Erickson, Silver Viking and other Clients will not constitute a partnership or joint venture for federal income tax purposes. The existence of a joint venture or a partnership must be resolved on a case-by-case basis. The principal factors and criteria determinative of that issue are stated in the Tax Opinion. The principal factors which indicate that a partnership or joint venture should not be found present here are that the mining claims will be titled solely to the Client, no

partnership agreement has been executed by the parties, and the profits and losses from mining operations are not shared equally be Erickson, Silver Viking, or other Clients. These factors clearly warrant a decision that no partnership or joint venture relationship exists between the various parties.

On or about December 20, 1978, petitioners executed identical development agreements with Erickson and mining contracts with Silver Viking. Each petitioner subscribed to one-half of an "investment unit" as was described in the offering memorandum. The development agreements provided as follows:

1. *Services Provided.* Consultant hereby agrees to perform and provide the following services for Client:

(a) *Development Services and Activities.* Consultant agrees to locate a mining claim in the general locale south of the Town in the County of Eureka, State of Nevada, which area is known as the Diamond Mine Project. Consultant further agrees that in the event unpatented property containing commercially marketable quantities of silver ore or other valuable minerals is located in the subject area, Consultant shall expeditiously perform such development services and activities as are required to develop a mine for the purpose of extracting the valuable ore. Such activities and services include rendering Consultant's opinions and advice as to the most efficient methods of exploiting and mining the ore, the driving of shafts, tunnels and galleries as might be required to make the ore accessible, removal of any overburden, if required prior to the time production of mined ore commences, and the like. Consultant agrees to provide, at his own cost, all labor, materials, equipment and supplies, and be solely responsible for all other expenditures required to accomplish all duties and obligations assumed hereunder. Consultant agrees to prepare for the Client a written report explaining the scope and extent of the development services and activities rendered hereunder and the results of such activities and services, including Consultant's recommendations as to future activities concerning the developed property.

(b) *Reports and Documentation.* The reports and documentation required by subparagraph 1(a) shall include the following:

(i) Periodic progress reports of development activities performed;

(ii) Preparation of a final geological report or summary of results of development and, if desired, the arranging for an independent geological report of final results by a recognized geologist; and

(iii) Compilation of maps of geological work performed, which may include drilling, assaying, geological work, petrographic data, mapping, and any other work or services required to satisfy Consultant's obligations hereunder.

2. *Consideration.* In consideration for the services identified in paragraph 1, Client agrees to pay Consultant the sum of Fifty Thousand Dollars ($50,000.00), payable as follows:

(a) Upon execution of this Agreement, the sum of Ten Thousand Dollars ($10,000.00); and

(b) The balance of Forty Thousand Dollars ($40,000.00) payable by Client to Consultant in installments, including interest at the rate of Eight Percent (8%) per annum, in amounts equal to Fifty Percent (50%) of the net proceeds received by Client from valuable mineral bullion refined from ore extracted from mining claims or other property located by Consultant for Client. * * *

3. *Client's Right to Claim.* Consultant acknowledges that, upon payment in full of the consideration set forth in paragraph 2, Consultant shall retain no further rights or interests in any mining claims or other property rights as may be generated or developed pursuant to this Agreement, and agrees to release his security interests created pursuant to that paragraph.

4. *Best Efforts.* Consultant hereby agrees to use his best efforts in the performance of all of the duties, responsibilities and obligations which are hereby undertaken. Consultant further acknowledges that it is the objective of Client to acquire valid and enforceable mining or milling claims in the Diamond Mine Project by this Agreement, and therefore agrees to perform the services and functions required to accomplish such objective, including recording the Certificates of Location for any claims staked, and preparing and recording a Claim Map and filing these documents with the County Recorder and Bureau of Land Management, together with all other documents and instruments required to establish a mining claim under the applicable governmental rules and regulations. Consultant agrees that such services and functions shall, to the extent possible, be performed in compliance with and in fulfillment of the regulations and requirements of applicable local, state and federal governmental authorities relating to the creation of a valid mining and/or milling claim. Client agrees that the consideration payable to Consultant hereunder shall be considered earned and all of Consultant's duties and responsibilities assumed hereunder satisfied if Consultant uses his best efforts to stake on Client's behalf a one-half ($\frac{1}{2}$) undivided interest in a valid and enforceable mining claim in the Diamond Mine Project, and if Consultant uses his best efforts to accomplish such objective and the other objectives set forth in this Agreement, for a period of one (1) year from the date of this Agreement, without regard to actual results thereby obtained.

5. *Development Expenditures.* The parties acknowledge and agree that they intend the services and activities to be provided by Consultant hereunder to qualify as development expenditures under Section 616 of the Internal Revenue Code for federal income tax purposes. Accordingly, Consultant agrees to restrict his activities performed pursuant to this Agreement to those activities which qualify for the deductions under the aforementioned Code section, and as advised by Client's tax consultant.

6. *Client Risk.* Client acknowledges that Consultant has not guaranteed or warranted that any mining site will be located and established, and further acknowledges that this transaction constitutes a high risk expenditure with no assurance of generation of gain or profit or return of development expenditures.

7. *Indemnity.* Consultant assumes all liability for all losses, damages, injuries and deaths, including loss or damage to any property (in connection

with or arising from the services and activities performed by Consultant pursuant to this Agreement) * * *

8. *Independent Contractor.* It is not the purpose or intention of this Agreement to create a joint venture or partnership relationship of any type or variety between the parties; and nothing herein shall create or be construed to create such a joint venture or partnership. The parties further intend Consultant to be an independent contractor and not an employee or agent of Client.

9. *Termination.* Either party may terminate this Agreement at any time by giving written notice to the other party specifying that the termination is being made under the provisions of this paragraph and specifying the effective date of termination, if: (1) either party should be or become insolvent; (3) either party should make a general assignment for the benefit of creditors; (3) any proceedings should be brought by or against either party seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future bankruptcy acts or under any other applicable federal or state law or regulation; (4) either party should be guilty of a substantial violation of any of the provisions of this Agreement; or (5) either party should be or become incompetent.

Pursuant to the development agreements, each petitioner paid $10,000 to Erickson by cashier's check and executed a nonrecourse note for $40,000 payable to Erickson. Of the amount paid in cash, $2,400 was designated as "administrative expenses" consisting of finders' fees, legal fees, and other miscellaneous expenses connected with the offering. Erickson was also authorized to utilize up to 4 percent of the amount received under the promissory note for administrative expenses.

The mining contracts between petitioners and Silver Viking also expressly negated any intention to form a joint venture. These agreements called for payment of $38 (subject to cost-of-living adjustment) for each ton of ore to be mined and processed from petitioners' claims. The term of the agreement, however, did not commence until petitioners notified Silver Viking, in writing, that a valid mining claim had been staked in their names. The terms of the agreement were expressed as contingent on events that might (or might not) occur in the future. For example, the contract began "WHEREAS, Client is or will be the owner of a mining claim located in the Diamond Mine Project, Eureka County, Nevada, which mining claim is described on Exhibit 'A' attached hereto (hereinafter the 'mining claim')." No Exhibit "A" was in fact attached. Paragraph 6 provided:

6. *Mining Techniques and Methods.* Client hereby grants to Contractor the full authority to mine and work the mining claim using any technique or method Contractor, in his sole discretion, determines is the optimal method or technique for extracting the maximum amount of such ore as is commercially and economically feasible. If Contractor should determine that the best method available is to create tunnels beneath the surface of the mining claim, or expand currently existing tunnels, and that Contractor determines that the rights to Client's mining claim as well as surrounding properties and claims may be required to construct such mine tunnel, then Client agrees that Contractor shall have the authority to use such mine tunnel technique to mine the ore located beneath Client's mining claim. Client also acknowledges and agrees that Contractor cannot practically segregate the ore mined from beneath Client's mining claim from that mined from other claims linked to the mined tunnel. Client therefore agrees that for the purpose of determining the amount and quality of ore which was extracted from Client's claim, Contractor shall assume that the claims linked with or adjacent to such mine tunnel which are owned by Client and by third parties to which Contractor has similar mining rights all contribute an equal amount and quality of such ore to the total ore tonnage extracted from the mine tunnel. If such other mine claim owners have also contracted with Contractor to perform all mining, refining and other processing activities, then Contractor shall be entitled to assume the bullion processed from the ore was also attributable equally to all such claims. If smaller or partial mining claims are owned by such third parties, the tonnage of ore or quantity of bullion allocable to such claims shall be reduced accordingly. Contractor agrees that no allocation of ore or bullion shall be attributable to any mining claims owned by Contractor in the Diamond Mine Project. Client hereby agrees that the mining claims owned by Einar C. Erickson shall, for purposes of this computation, be deemed to contribute toward the total output of all of the claims Fifty Percent (50%) of all such output. Accordingly, one-half (½) of the ore and bullion refined therefrom shall be allocated to Mr. Erickson for his claims.

Petitioners never notified Silver Viking, in writing or otherwise, that they had a valid mining claim.

On Schedule C attached to his tax return for 1978, each petitioner deducted $50,000 labeled "Development Expenses Deductible Pursuant to Code Sec. 616, Eureka, Nevada."

A Certificate of Location of Lode Mining Claim, locating Silverado claim #288, was filed for petitioners with the Eureka County recorder on November 7, 1979, by Lynn H. Erickson (agent). The certificate of location reported that the claim was located on September 19, 1979, and that physical staking of the claim was done by October 2, 1979. No development work was ever performed on Silverado claim #288. Silverado claim #288 is located on the steep eastern

face of an abrupt peak called Prospect Mountain. Silverado claim #288 is, in mining terms, barren rock.[3]

Silverado claim #288 was located in an area that Erickson called the Diamond Mine Project. It was not, however, a part of the so-called Diamond Mine or Diamond Underground Mine, which was discovered in the 19th century and extensively mined for a few decades thereafter. Neither the development agreement nor the mining contract entered into by petitioners in 1978 gave them any interest in the Diamond Mine, as contrasted to a new mining claim to be located for them.

On October 1, 1978, Erickson and Silver Viking, as lessees, and Exxcel Energy Corp., as lessor, entered into a "Lease Agreement With Option To Purchase Mining Claims and Equipment" with respect to the Diamond Underground Mine. On August 28, 1980, Diamond-Treasure Hill, Inc., a subsidiary of SSHK, Inc., a Nevada corporation formed in 1980, entered into a 99-year sublease of mining interest, under which it obtained the interest previously acquired by Erickson and Silver Viking from Exxcel Energy Corp. As of the date of the sublease, a total of $275,000 had been spent in relation to those mining properties, and Diamond-Treasure Hill, Inc., thereafter spent $750,000 on development costs and approximately $250,000 on the actual mining, processing, and refining of ore from the Diamond Mine. Operations on the Diamond Mine ceased in 1981 without realization of profit by the owners.[4]

On two occasions, in February 1981 and February 1982, Erickson billed petitioners for interest on their 1978 notes. On the later occasion, Erickson reported to petitioners that the face amounts of their notes had been reduced by distributions of products from the Diamond Mine.

---

[3]Detailed findings of fact concerning the nature of claim #288 were proposed by respondent. The general findings of this paragraph, however, were not objected to by petitioners, who contend that these findings are irrelevant because of the levels in ores in the nearby Diamond Mine (discussed *infra*). More detailed findings, therefore, are not necessary.

[4]A representative of SSHK, Inc., testified that he was "not very comfortable" about entering the silver market in 1978; thought that the operations were profitable through 1980; and that mining operations ceased in 1981 when "the market dropped out."

## 2. *Procedural History*

On motion of petitioners, the within cases were set for trial in Phoenix, AZ, and designated to serve as test cases with respect to the issues herein and in other cases involving the same issues in which petitioners were represented by the same counsel. At the time of trial, the parties filed an Agreement for Settlement in which petitioners in 14 other cases (listed in note 2 *supra*) and respondent agreed that they would be bound by the result in the within case "on the issue set forth in the pleadings and the notice of deficiency as determinative of the proper treatment of the development expenses, with respect to the Silverado claims." At the commencement of trial, respondent filed a trial memorandum setting forth his legal arguments as follows:

I. Payments to Erickson Were for Acquisition of a Mining Claim, Not Development Expenditures.

II. Lack of "Discovery" Requirement for Valid Unpatented Mining Claims.

III. The Non-recourse Note Was Too Contingent and Hence Not Deductible.

IV. Only An Accrual Basis Taxpayer Could Deduct the Portion of the Development Expenses Evidenced By the Promissory Note.

V. The Taxpayers Can Not Deduct the Development Costs Because It Results in a Distortion of Income.

VI. Joint Venture or Partnership With Erickson Or With Other Investors Subjects Petitioners to "At Risk" Provisions of I.R.C. Sec. 704(d).

VII. Lack of Economic Interest in the Minerals.

VIII. Lack of Economic Substance - Sham Argument.

During trial, petitioners' counsel insisted that the only issue before the Court was that set forth in the notice of deficiency as follows: "The development expenditure claimed is not allowable under IRC sec. 616 since it has not been established that the existence of ores or minerals in commercially marketable quantities has been ascertained." Petitioners' evidence was limited to an attempt to show that the Diamond Mine had proven ore reserves and profit potential. Petitioners objected to evidence offered by respondent with respect to Silverado claim #288 and to respondent's interrogation of petitioner Anderson as to his background, the manner of preparation of his tax return, and unrelated tax shelter investments reflected on his tax return. When some of petitioners' objections were

overruled, petitioners' counsel orally moved to withdraw the Agreement for Settlement on behalf of petitioners in the 14 related cases. The Court denied the oral motion but advised petitioners' counsel that they could submit a motion in writing supported by affidavits of the petitioners in the other 14 cases showing that the facts of their cases differed from the facts of the cases then being tried.

At the conclusion of the trial, the Court directed simultaneous briefs by the parties. The Court further directed that respondent's brief should address the matter of variance of his theories at trial from the ground of disallowance stated in the notice of deficiency and that petitioners' brief should address the various issues in respondent's trial memorandum, both as to substance and as to whether or not they could be considered by the Court, i.e., whether there was prejudicial variance from the notice of deficiency and the pleadings. Neither petitioners' opening brief nor their reply brief addressed any of the issues raised in respondent's memorandum or the variance question discussed at length in respondent's opening brief. A Motion to Withdraw Agreement for Settlement was filed by petitioners, but they did not attach any affidavits or otherwise show any factual difference between the within cases and those of the petitioners in the 14 related cases. The motion did not contain any authority in support of petitioners' contentions with respect to the issue to be decided, and did not even attempt to distinguish the authorities cited on that point in respondent's brief.

### ULTIMATE FINDINGS OF FACT

Petitioners acquired no interest in the Diamond Mine in 1978, as joint venturers or otherwise.

The amounts paid and nonrecourse notes delivered to Einar Erickson by petitioners during 1978 were not paid or incurred for the development of a mine or other natural deposit after the existence of ores or minerals in commercially marketable quantities had been disclosed.

### OPINION

Section 616(a) provides in part as follows:

SEC. 616. DEVELOPMENT EXPENDITURES.

(a) IN GENERAL.— * * * [Absent an election under section 616(b)], there shall be allowed as a deduction in computing taxable income all expendi-

tures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. * * *

Section 1.616–1, Income Tax Regs., provides as follows:

Sec. 1.616–1. Development expenditures.

(a) *General rule.* Section 616 prescribes rules for treating expenditures paid or incurred by the taxpayer for the development of a mine or other natural deposit (other than an oil or gas well). Development expenditures under section 616 are those which are made after such time when, in consideration of all the facts and circumstances (including actions of the taxpayer), deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer. Under section 616(a), a taxpayer is allowed a deduction for development expenditures whether or not such expenditures are made in the development or production stage of the mine or other natural deposit. Under section 616(b), the taxpayer may elect to defer development expenditures made in the development or producing stage and to deduct such expenditures ratably as the minerals or ores benefited are sold. While the mine or deposit is in the development stage the election applies only to that portion of the development expenditures which is in excess of net receipts from the mine or deposit. See sec. 1.616–2 for rules with respect to the election to defer. It is not necessary that the taxpayer incur the development costs directly. He may engage a contractor to make the expenditures on his behalf.

Section 616 obviously contemplates that expenditures for development are incurred on property in which a taxpayer has previously acquired some ownership, leasehold, or other proprietary interest. Expenses for acquisition of the interest, or even for acquisition of a right of access to the property, are not deductible. *Geoghegan & Mathis, Inc. v. Commissioner*, 55 T.C. 672, 675–676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972); *H.G. Fenton Material Co. v. Commissioner*, 74 T.C. 584, 591 (1980). In order for expenditures to qualify as mining development expenses, the mine must have reached the development stage, and the expenditures must be for the development of the mine. *Estate of DeBie v. Commissioner*, 56 T.C. 876, 890 (1971).

## *The Substantive Issues*

It is undisputed that no development was ever undertaken with respect to Silverado claim #288, the claim staked for petitioners during the year after the one in issue here. The primary dispute between the parties is over petitioners' claim that they had an interest in the Diamond Mine, where some operations did occur before and after the year in issue. They did not, argues respondent, and therefore the moneys allegedly paid by petitioners could not have been paid after the existence of ores or minerals in commercially marketable quantities had been disclosed. In his brief, respondent alternatively argues that the nonrecourse note does not provide a basis for deduction and that the entire transaction is a sham. Our resolution of the primary dispute makes it unnecessary for us to decide those other issues.

Petitioners' briefs do not cite a single authority other than section 616, *supra*, and section 617 (dealing with exploration expenses). They do not argue that the payments, or any portion of them, are deductible under any other section or rationale. Petitioners' sole argument is restated in their reply brief as follows:

As noted in Petitioners' opening brief, the Mining Contract constituted a joint venture between the Diamond Mine Group (the Petitioners herein), Einar Erickson and Silver Viking Corporation for the development of the Diamond Mine. * * *

Their evidence was directed solely to the existence of mineral deposits in the Diamond Mine.

Petitioners' arguments are factually unsupportable and ingenuous in view of the express terms of the contractual documents between them, on the one hand, and Erickson and Silver Viking, on the other. They totally ignore those terms, and the opinion of counsel to Erickson and petitioners set forth in the offering memorandum, and argue the effect of the writings as if the express terms did not exist.

The Court regularly looks to the substance of a transaction despite the labels attached to it by the parties. We do so even at the instance of the party responsible for the form. See, e.g., *Lazisky v. Commissioner*, 72 T.C. 495, 501–502 (1979), affd. sub nom. *Magnolia Surf, Inc. v. Commissioner*, 636 F.2d 11 (1st Cir.

1980). But in this case, there is no persuasive evidence that the intent of the parties or the actual relationship was other than that expressed in the agreements. The claim that petitioners acquired an interest in the Diamond Mine by way of a joint venture with Erickson is apparently an afterthought, unsupported by any evidence shown to be in existence prior to February 1982.

Nothing in the offering circular or in the agreements actually executed by petitioners during 1978 establishes a relationship between those agreements and the separate contracts entered into by Erickson with Exxcel Energy Corp., in 1978, or by Erickson and Silver Viking with Diamond-Treasure Hill, Inc., in 1980. Moreover, the 1980 agreement between Erickson and Silver Viking, on the one hand, and Diamond-Treasure Hill, Inc., on the other, contains no reference to any agreements with petitioners; and the 1978 lease agreement did not expressly or by reasonable implication anticipate any interest in petitioners. Although the 1980 sublease refers to "funds invested by the Silver Connor Group and the Diamond Mine Group," none of the evidence establishes a connection between this reference to the "Diamond Mine Group" as a source of funds and the amounts deducted by petitioners in 1978. The arguments of counsel do not overcome the enormous gaps in the evidence as to what occurred from the time when petitioners entered into the contracts in 1978, to the time of staking of Silverado claim #288 in 1979, to the dates of the self-serving reports rendered by Erickson in 1981 or 1982.

Petitioner Anderson was called as a witness by respondent, but he did not provide any information filling the gaps between the various agreements entered into by Erickson. His professed "understanding" that Erickson was a "general partner" and that he was a "limited partner" is unsupported by any objective foundation for such a conclusion. (Erickson did not testify, perhaps due to unavailability.)

Petitioners offered a purported "organization chart" prepared in the office of their counsel in an attempt to establish connections between Diamond-Treasure Hill, Inc., various corporations in which Erickson had an interest, and petitioners. That tendered exhibit was not supported by any docu-

ments from which the alleged connections could be verified; it was misleading; and it was not received in evidence.

Petitioners also attempted to establish a relationship between Silver Viking and the Diamond Group through an officer of Diamond-Treasure Hill, Inc., who was responsible for payment of royalties to Silver Viking. That witness, however, did not provide any link between the Diamond Group and petitioners as of 1978.

Petitioners had the burden of proving the relationship that they claimed gave them an interest in the Diamond Mine. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. They failed to do so, and the contracts in the record all support the conclusion that no joint venture or partnership existed.

In view of our finding that petitioners had no interest in mining property in 1978 and that, therefore, amounts paid to Erickson could not have been for development of any such interest, we do not address the other arguments made by respondent. (The facts found above, however, may well speak for themselves as to the value of the nonrecourse note and the overall character of the transaction.)

Similarly, we do not discuss at length the testimony of the experts presented by the respective parties. Petitioners do not challenge respondent's experts' testimony as to the questionable validity or value of claim #288, because petitioners contend that such testimony is irrelevant. Respondent criticizes the testimony of petitioners' expert as to the viability of operations at the Diamond Mine, but also argues that his testimony is irrelevant. Petitioners' expert did not offer any opinion as to the existence or validity of petitioners' claimed interest in any property.

### The Related Cases

Because the petitioners in related cases did not present any showing that their cases are factually different from the within test cases and because the test cases are decided on the issue tried by petitioners, the motion to be relieved of the Settlement Agreement will be denied. In any event, petitioners have not distinguished the authorities cited by respondent for the proposition that all of the points argued by respondent were duly placed in issue and that the additional arguments

merely support the issues tendered by the pleadings. Moreover, we do not believe that petitioners are either surprised or prejudiced by respondent's arguments. See *Considine v. Commissioner*, 74 T.C. 955, 964–966 (1980), appeal dismissed per stipulation (9th Cir. 1982); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973).

*Decisions will be entered for the respondent.*