**Joseph P. MEYERS and Ann S. Meyers, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 55–88T.**

United States Claims Court.

Sept. 17, 1992.

Edmund W. Rothschild, Cleveland, Ohio, attorney of record, for plaintiffs. Seeley, Savidge & Aussem, of counsel.

Jennifer Dover Spriggs, Washington, D.C., with whom was Acting Asst. Atty. Gen., James A. Bruton, for defendant. Mildred L. Seidman and Thomas D. Sykes, of counsel.

## OPINION

FUTEY, Judge.

This tax refund case is before the court after a trial on the merits held June 2, 1992.[1] Plaintiffs, Ann and Joseph Meyers (Meyers),[2] are seeking a refund of $13,520.00 and $25,976.44 for the taxable years 1976 and 1977, respectively. The basis for their refund request stems from a $402,-

---

**1.** This case was the subject of an earlier opinion filed June 14, 1990, wherein plaintiffs' summary judgment was denied. In the earlier opinion, plaintiffs asserted Virgin Islands' residency for 1978 which, if proven, might have divested this court of jurisdiction. Nonetheless, at trial, plaintiffs stipulated that they were not residents of the Virgin Islands in 1978 for the purposes of this action.

**2.** References to "Meyers" indicate Joseph Meyers who was plaintiffs' only witness.

099.00 net operating loss (NOL) claimed on plaintiffs' 1978 taxes which plaintiffs, in part, carried back to 1976 and 1977 to off-set taxes in those years. The Internal Revenue Service (I.R.S.) subsequently disallowed $400,172.00 of the deduction allegedly spent on mining development expenses in a Panamanian gold mine. Defendant maintains that plaintiffs must demonstrate that they in fact incurred mining development expenses that are deductible under Internal Revenue Code (I.R.C.) § 616(a) (1954).[3]

### Factual Background

Plaintiffs filed an amended income tax return for 1976 and 1977 claiming respectively, $13,520.00 and $25,313.42.00 The claim for refund was based on an NOL carryback of $402,099.00 from plaintiffs' 1978 federal income tax return. Of that deduction, $400,172.00 stemmed from a claimed investment in the International Monetary Exchange (IME). Defendant avers that during 1978 IME promoted a tax shelter under the name of "Gold For Tax Dollars" which purportedly provided a $4.00 tax write-off for each $1.00 invested. The subject of the tax shelter was mining leases in a Panamanian gold mine. This same shelter has been the subject of several cases that ultimately disallowed the claimed deductions. *See Kennedy v. Commissioner,* 876 F.2d 1251, 1255 (6th Cir. 1989); *Gray v. Commissioner,* 88 T.C. 1306, 1323 (1987); *Saviano v. Commissioner,* 80 T.C. 955 (1983). According to defendant, the investor would acquire a mineral lease in Panama through IME. The investor would then deposit cash equal to one-fourth of the amount of tax deduction desired. To cover the remaining three-fourths of the purchase price, the investor would take out a non-recourse loan secured only by the mineral claim itself. The investor would then deduct the total amount; the actual cash invested, plus the amount of the loan.

Plaintiffs' alleged investment consisted of $100,000.00 in cash and $300,000.00 in loans from IME itself. Meyers signed mineral leases for 250,000 cubic meters of auriferous gravels[4] in the Tuquesa Mining Concession No. 35 (Concession) in 1978. Meyers' agreement allowed him to choose, at a later unspecified date, the site of his 250,000 cubic meters. The Panamanian government cancelled the Concession in 1981 before any gold was ever mined from plaintiffs' purported leases.

By letter dated June 24, 1987, the I.R.S. disallowed plaintiffs' claims for refund for 1976 and 1977. Plaintiffs filed a complaint in the Claims Court on January 25, 1988, in which they claim a total refund of $39,-496.44 for the years 1977 and 1976.

Defendant asserts several grounds upon which plaintiffs' deduction should be disallowed. Defendant maintains that plaintiffs did not prove that any development occurred. Moreover, defendant contends that the investment had no commercial viability as required for deduction of a mining development expense under I.R.C. § 616(a). In addition, defendant avers that plaintiffs never acquired a proprietary interest in the land, which is a prerequisite to mining expense deductibility. Finally, defendant claims that plaintiffs did not have a *bona fide* profit motive.

Plaintiffs counter that their investment in IME is not similar to the IME tax shelters that have already been litigated. Plaintiffs maintain that they in fact had a *bona fide* business profit motive. Thus, plaintiffs feel that their case is distinguishable.

### Discussion

A. Development

Under I.R.C. § 172(a) taxpayers are allowed to deduct from a taxable year the NOL carryback from a succeeding year. Section 172(c) states that an NOL is "the excess of the deductions allowed ... over gross income." Thus, when a taxpayer's

---

3. The years in issue predate the 1986 tax code; accordingly, tax code references are to the Internal Revenue Code of 1954.

4. Auriferous gravels are those gravels yielding or containing gold.

deductions exceed his income for the year, the taxpayer may carryback the excess to previous years' income and thereby reduce the tax paid in previous years by receiving a refund. Authority for the deduction lies in § 616(a), which provides:

> [T]here shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year *for the development of a mine* or other natural deposit ... if paid or incurred *after the existence of ores or minerals in commercially marketable quantities* has been disclosed. [Emphasis added.]

The burden rests upon the taxpayer to prove by a preponderance of the evidence that he is due a refund. *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935); *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932).

Thus, initially, in order for the expenses to qualify for the § 616 mining development deduction, "the mine must have reached the development stage, and the expenditures must be for the development of the mine." *Anderson v. Commissioner*, 83 T.C. 898, 908 (1984). Defendant's expert, Dr. Howard L. Stensrud, a professor of geology and department Chair at California State University,[5] testified that development costs cover work prior to commencement of mining. This includes clearing the trees, stripping away the overburden, and developing a water supply.

Plaintiffs have presented little evidence that any development was ever performed on the property. Plaintiffs proffered two bills for $200,000.00 each, marked paid for development work, dated November 29, 1978 and December 29, 1978, respectively. Neither bill, however, was signed or described the type of development work done. Meyers also offers a letter dated May 29, 1981, from Michael M. Murphy, a principal of IME, stating that all expenditures made on his behalf were for development work only and that no money was spent for exploration or capital improvements. This letter also did not include a description of the work. In addition, according to the testimony of Dan Sutherland, a revenue agent in the San Jose Fraud Group of the IRS, Michael M. Murphy is an alias for Gerald Leo Rogers, one of the promoters of the IME shelter, who also went by the alternative aliases of P.T. Smith and Claude de Blu. According to Sutherland, Gerald Rogers received a 25–year sentence and is now incarcerated in Arizona in connection with the IME scheme.

Still, Meyers testified that he had received development benefits: specifically, the maintenance of the air strip, the clearing of the various sites and the installation of a road. Yet Meyers could not tell the court how much was spent in clearing roads and maintaining the airstrip. Meyers testified that there was already an airstrip on the Concession when he initially visited the property, *before* he invested in it. Moreover, Professor Stensrud testified that an earlier miner had renovated the airstrip and that there were no other airstrips on the Concession. Professor Stensrud noted that, except for one road that was begun in 1979, 50 kilometers from the Concession at the Chucunaque River, the only roads were small, built locally, and were not suitable for large scale heavy equipment. Meyers testified that Mario Fonseca Lopez, the lawyer for IME, reported to Meyers that the money was being spent rapidly, primarily on the access road. The reliability of this source, however, is questionable.[6]

Meyers asserts that the plan was for IME to do general development of the Concession. Meyers contends that eventually he was going to take over the development of his 250,000 cubic meters of gravels, but that he was not going to commence extrac-

---

5. Professor Stensrud has also been a mineral exploration consultant to various companies.

6. IME was found to be a "fraudulent factual sham" in several cases. *Gray v. Commissioner*, 88 T.C. 1306, 1327 (1987); *Kennedy v. Commissioner*, 876 F.2d 1251 (6th Cir.1989); *see also* *Saviano v. Commissioner*, 80 T.C. 955 (1983). In addition, I.R.S. agent Sutherland testified that the United States Government indicted Mario Fonseca Lopez in connection with the IME "Gold for Tax Dollars" shelter.

tion for several years. Meyers testified that he did not arrange for anyone to develop his site, since he did not know which 250,000 tract he was going to exploit. According to Meyers, he was waiting to select his specific site until IME obtained more information on which sites were producing the most gold.

According to Professor Stensrud, however, one cannot develop a property and then come back at a later date to mine. This is because previously built dams deteriorate and previously cleared vegetation regrows. Moreover, removal of the vegetation allows erosion of the gold-bearing gravels. With an unidentified claim, limited work could be accomplished, such as providing access to the general area, but as Professor Stensrud pointed out, "without knowing where the actual site of the gravels is, how would one know which trees to remove? How would one know where to develop the water source ...?"[7]

Meyers did not revisit the site, after his initial inspection, to monitor how his development money was being spent. Instead, he relied on the vague assurances of representatives of IME that some "development" was occurring. These same representatives have been indicted in connection with the IME mine. Although Meyers may have believed that development of the Concession was being undertaken, the statute contemplates no subjective test. The deduction is for mining development expenses paid or incurred in the year for which the deduction is being taken. *See* I.R.C. § 616(a). Accordingly, this court finds that there is no reliable evidence that any development was performed on the Concession after plaintiffs' investment.

**B. Commercial Viability**

Treasury Regulation (Treas.Reg.) § 1.616–1(a) explains—

Development expenditures under section 616 are those which are made after such time when, in consideration of all the facts and circumstances ... deposits of ore or other mineral *are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation* by the taxpayer. [Emphasis added.]

*See also Kennecott Copper Corp. v. United States,* 171 Ct.Cl. 580, 624, 347 F.2d 275 (1965). Thus, the facts and circumstances must indicate whether there was gold in a sufficient quantity to be commercially exploitable *before* money is invested in developing the mine.

Meyers himself admits "you cannot cost justify the establishment of proven reserves for 125,000 or 250,000 cubic meters. That's totally unrealistic."[8] Plaintiffs assert that a smaller miner would take a greater risk. Nonetheless, § 616(a) requires that commercially marketable ores are *proven* and it makes no exceptions for small entrepreneurs. Plaintiffs maintain that the Panamanian government will not grant a mining concession unless the land is commercially exploitable. Nonetheless, at trial Professor Stensrud testified "commercial and marketable quantities of gold did not exist" in the Concession.[9] Professor Stensrud based his testimony on reports of drilling done on the Concession in 1972 and 1973. Moreover, Professor Stensrud testified that the venture was not feasible because:

[T]he values were not demonstrably high enough, but indeed, the quantity of gravels that were leased—the 250,000 cubic meters—given the values of gold that I would predict would be in those gravels, the economic feasibility does not work out because the cost of obtaining and bringing equipment of an appropriate size to the site, all costs considered, and then adding into this other considerations such as royalties and tax obligations to the country and the like, all of these put together would suggest *there is no likelihood of success.*[10] [Emphasis added.]

Meyers testified that he visited the Panamanian Bureau of Mines (Bureau) prior to investing in the mine. According to Mey-

---

7. Transcript (Tr.) at 271.

8. Tr. at 326.

9. Tr. at 274.

10. Tr. at 280.

ers, the Bureau had "actual records" of drilling, including core samples, from an estimated 500 holes. The Bureau allegedly showed Meyers a plat and some reports in Spanish which they translated for him. The reports, Meyers avers, indicated 8 to 10 troy ounces of gold per cubic meter of gravels, which Meyers admits he found to be "phenomenal." Although Meyers described the Bureau's information as "very extensive," he did not submit any of these "extensive" reports into evidence. Meyers also testified that the employees at the Bureau told him that Panama does not grant concessions until commercial quantities of gold have been demonstrated. Notwithstanding this, Meyers at trial admitted that he was concerned about whether the employees at the Bureau were telling him the truth when they estimated a heavy concentration of gold. Meyers testified that, based on his suspicions, he discounted the estimated gold concentration by half, to calculate whether he could make a return on his investment.

Nonetheless, as to Meyers' testimony concerning records of core samples, Professor Stensrud testified that the material in the Concession is "virtually impossible to core ... You can drill it. You can sample it. But you can't core it, because it simply does not have any internal integrity. You would simply get loose material out." [11] In addition, Professor Stensrud testified that the report of 8 grams of gold per cubic meter of gravels was not credible based on his inspection of Concession property reports. Previous exploration on the Concession in the early 70's recovered .77 grams per cubic meter and .55 grams per cubic meter.

Plaintiffs did not produce any evidence of surveys, appraisals or geographic descriptions to show that this was a commercially viable operation. Plaintiffs also did not produce any expert witnesses as to the viability of the mining concession. Meyers relied on evidence from the Bureau that he admittedly found suspicious. Yet instead of seeking a second opinion, Meyers halved the reported amounts of gold per cubic meter. Meanwhile, other reports [12] on the property clearly showed that the amounts of gold present did not represent commercially marketable quantities, especially to a small mine operator. Accordingly, the court finds that there was no showing of commercially marketable quantities of gold prior to plaintiffs' investment in the mine.

### C. Proprietary Interest

Even if the mine were commercially viable, defendant also asserts that plaintiffs did not hold a proprietary interest in the land as required by § 616. *Anderson,* 83 T.C. at 908; *Becker v. Commissioner,* 868 F.2d 298, 299 (8th Cir.1989). Defendant maintains that plaintiffs had no identifiable mining claims. Hence, defendant asserts that plaintiffs could have no proprietary interest in land to use as a basis for their deduction.

Initially, there is a question as to whether plaintiffs ever actually paid for their mining leases. Plaintiffs contend that the investment consisted of $100,000.00 in cash and $300,000.00 in loans from IME. Plaintiffs have proffered a copy of a check for $50,000.00 made out to IME on November 28, 1978. Nonetheless, it is only the front copy of a check and does not indicate whether it was negotiated. Plaintiffs bolster this exhibit with a bank statement showing that a $50,000.00 check was drawn on their account on November 28, 1978. Plaintiffs seek to prove the second $50,-000.00 payment by a report mailed to the Commissioner of Customs reporting a $50,-000.00 bank draft to IME. Plaintiffs have no other proof of the second $50,000.00 payment, other than two unsigned receipts for a total of $400,000.00 marked paid from IME.

As to the $300,000.00 loan agreements, I.R.S. agent Sutherland testified that IME

---

**11.** Tr. at 293.

**12.** Professor Stensrud based his testimony on a series of reports begun in 1973 by Tyler Kittredge, a geologist who attempted to develop the Concession. Professor Stensrud also relied upon an exploration study done by Dr. Charles Au, who had financed a drilling project in the Concession during the 70's.

was a shell corporation that had no monies to loan, no personnel, no workers, and no license to operate within the country of Panama. Moreover, of the alleged $400,-000.00 payment, Meyers has produced no evidence of how much of this amount went to purchase the lease. Acquisition of a lease is not deductible under § 616. *Anderson* at 908; *Cushing Stone Co. v. United States*, 210 Ct.Cl. 62, 75, 535 F.2d 27 (1976). Meyers would have the court believe that he paid nothing for the actual acquisition of the lease.

In addition, the mineral claim leases state: "Lessor hereby demises, [and] leases ... the number of cubic meters of auriferous gravel on the Leased Premises as per Condition 1, Exhibit 1." Exhibit 1 is missing from both lease agreements. More importantly, though, the leases refer to cubic meters. This is a volume. A volume of auriferous gravels cannot be established until the thickness of the gravels in an area is ascertained. Professor Stensrud testified that there was insufficient data available to determine the exact thickness of the gravels throughout the property. Moreover, Professor Stensrud stated that the information that was available indicated a significant variation in thickness of the gravels; from as little as 2 or 3 meters to over 10 meters. Meyers testified that no exact parcel was leased to him, rather he was given the option to choose a parcel in the future. But Professor Stensrud stated that it would be impossible to calculate the dimensions of a parcel containing 250,000 cubic meters of gravels from a surface survey.

The court finds that plaintiffs did not sustain their burden of proving payment. There was no showing of a correlation between the copy of the check and the bank statement indicating that a $50,000.00 check was drawn on plaintiffs' account. In addition, the copy of a report mailed to the Commissioner of Customs is insufficient evidence that the second $50,000.00 payment was made. Finally, there is inadequate evidence that plaintiffs were ever

actually loaned $300,000.00. Moreover, assuming *arguendo* that plaintiffs had proven payment, they still have not sustained their burden of proving how much of this amount actually went towards acquisition of the lease, and how much went towards development. Further, plaintiffs did not prove that they had a proprietary interest in a specific parcel of land because, from the data available, no specific parcel could be surveyed. Accordingly, plaintiffs have not sustained their burden of proving that they had a proprietary interest in the land which they allegedly were developing.

### D. Profit Motive

Under § 616 the activity giving rise to the deduction must also be "an activity engaged in with the primary purpose and objective of making a profit." *Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985).[13] This is a question of fact for the plaintiffs to prove based on all facts and circumstances. *Eastman v. United States*, 225 Ct.Cl. 298, 304, 635 F.2d 833 (1980). This follows from I.R.C. § 183(a) which limits all tax deductions for activities not engaged in for profit:

> In the case of an activity engaged in by an individual ... if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

Treas.Reg. § 1.183–2(b) provides a non-exclusive list of factors for determining the profit motive:

> (1) the manner in which the taxpayer carries on the activity;
>
> (2) the expertise of the taxpayer or his advisors;
>
> (3) the time and effort expended by the taxpayer in carrying on the activity;
>
> (4) expectation that assets used in the activity may appreciate in value;
>
> (5) the success of the taxpayer in carrying on similar or dissimilar activities;

**13.** Defendant also characterizes plaintiffs investment as a sham transaction. Since this court finds that there was no development, no com-

mercial viability, no proprietary interest in the land and no profit motive, it is unnecessary to reach this issue.

(6) the taxpayer's history of income or losses with respect to the activity;

(7) the amount of occasional profits, if any, which are earned;

(8) the financial status of the taxpayer; [and]

(9) elements of personal pleasure or recreation.

Moreover, transactions entered into solely for tax benefits are not profit motivated. *Hines v. United States*, 912 F.2d 736, 739 (4th Cir.1990).

Plaintiffs maintained no formal books or systematic records for earnings and expenses in connection with their purported mining operation. Nonetheless, Meyers avers that he had the personal knowledge and expertise to exploit the leases. In support of Meyers' expertise, plaintiffs point to Meyers' bachelor degree in geology with a minor in physics and his connection with previous gold mining ventures. Meyers, at trial, recounted previous joint ventures from which he had made profit, including one in Alaska and one in the Philippines. He also noted that he had lost money in a mining venture in Nevada. In addition, plaintiffs point out that Meyers was the president of a manufacturing company whose products incorporated gold in their manufacture. Thus, Meyers relied on his own background and on information provided to him by the Bureau in deciding whether to invest in the mine.

Therefore, plaintiffs argue that Meyers had the relevant expertise and that their investment was profit motivated. Nonetheless, "a taxpayer's mere statement of intent is given less weight than objective facts." *Hines* at 740. Professor Stensrud testified that a letter from Meyers to IME dated November 28, 1978, informing IME that he would bring his own equipment and crew onto the site for 60 to 90 days indicates a development plan that was not economically feasible. Professor Stensrud noted that the cost factor of bringing on the equipment would outweigh the profit to be realized from the quantity of gold avail-

able. A prior feasibility study done [14] on the Concession indicated that it would take a year to produce 386,000 cubic meters of gravels. Meyers countered that the 60 to 90 day estimate had been off the top of his head and was not meant to be a limitation on the time he would spend on the property.

Plaintiffs contend that Meyers put his own time and effort into setting up his leases. Meyers maintains that he made two trips to Panama to personally inspect the mining concession, consult with the commercial attache at the United States Consulate in Panama City concerning the legal validity of the mining concession, and to meet with the counsel for the lessor's agent. Yet, Meyers only once visited the mining site for approximately 20 to 30 minutes and never visited it thereafter to ascertain how his money was being spent in development. No profit was ever realized from plaintiffs' investment in the Panamanian mine.

In view of Meyers' lack of business records for this venture and the lack of profit associated with the project, especially in light of testimony that indicates that no profit could be made, the court finds that this activity was not profit motivated.

For the foregoing reasons the court finds that plaintiffs are not entitled to a tax refund for the years 1976 and 1977. The Clerk is directed to enter judgment in favor of defendant. No costs.

---

**14.** A study was performed in 1978 by Greg Bryan, a mining engineer who was working as a consultant for Behre–Dohlbear. Behre–Dohl-

bear, a New York corporation, was inquiring into the feasibility of mining the Concession.