DAYTON W. ADAMS, JR., AND SHELLEY A. ADAMS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 922–82.     Filed August 22, 1985.

*David E. Weiss, Howard J. Kalson,* and *Donald W. Geerhart,* for the petitioners.

*Terence D. Woolston* and *Fera Wagner,* for the respondent.

COHEN, *Judge*: Petitioners have asked the Court to relieve them of a settlement agreement in which they agreed to be bound by the result in the cases of *Anderson [and Clawson] v. Commissioner,* 83 T.C. 898 (1984), on appeal (9th Cir., Mar. 5, 1985) (*Anderson*). Petitioners claim that the attorney who entered into the agreement on their behalf was not authorized

to do so and had a conflict of interest by reason of his prior representation of the promoter of the tax shelter in which they invested.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation is incorporated herein by this reference. Petitioners were residents of Arizona at the time they filed their petition herein. Dayton W. Adams, Jr. (petitioner), entered into the transactions about which the dispute in this proceeding arises.

### Operative Facts

In 1978, petitioner was a senior investment salesman for Coldwell Banker & Co. (Coldwell Banker). Petitioner had his own clients and conducted his business as if in partnership with Coldwell Banker. He was in the top 20 income-producers for the company and earned in excess of $200,000 in that capacity in 1978. Subsequent to 1978, petitioner became a partner in a major real estate development firm in Arizona with responsibility for acquisitions and dispositions of income-producing real estate. He thus had substantial business experience at all times material to this proceeding.

In March 1978, petitioner attended a seminar on investments sponsored by Coldwell Banker. The speaker at the seminar was Wayne A. Smith (Smith), a Phoenix attorney. Smith discussed various tax-advantaged investment opportunities. Smith stated that the best tax-oriented investment he had seen was being organized in Nevada by a geologist by the name of Einar C. Erickson (Erickson). The Erickson program described at this meeting involved acquisition of mining claims, called A & B claims, and subsequent donation of the claims to a charity (the charitable contributions program). At the end of the seminar, petitioner met with Smith to discuss further the investments and petitioner's tax situation. Smith recommended that petitioner also speak to Gregory Davis (Davis), an accountant with knowledge of the Erickson program.

After several meetings, Smith and Davis encouraged petitioner to become a participant in the charitable contributions program and in another Erickson program referred to as the

"Diamond Mine Project." Smith and Davis represented that they individually were participants. Petitioner was aware that Smith, as counsel for Erickson, wrote the tax opinion contained in the Diamond Mine Project offering memorandum and prepared the contractual documents executed by participants in that program. He specifically raised with Smith the question of conflict of interest and was told by Smith that there was none. Smith also told petitioner that he could disregard the "boilerplate" disclaimers in the offering memorandum. Petitioner also contacted third persons before investing in the Erickson programs.

Petitioner acquired an interest in A & B claims and, in December 1978, became a participant in the Diamond Mine Project. His participation was reflected in agreements identical to those described in *Anderson*, 83 T.C. at 900–904. Briefly, those documents were (1) an agreement under which Erickson was to locate and stake for petitioner a mining claim and to perform services in relation thereto that would be deductible under section 616,[1] dealing with development expenses, and (2) a mining contract with Silver Viking Corp., a corporation owned by Erickson, dealing with ore to be extracted from the claim to be located and staked for petitioner by Erickson. (We found in *Anderson* that those agreements expressly negated any joint venture between participants and Erickson, and they gave participants no interest in any mining property prior to the staking of a new claim on their behalf.) Petitioner gave Erickson a $30,000 check and a nonrecourse note for $120,000 for 1½ units in the Diamond Mine Project.

On their tax return for 1978, petitioners deducted $150,000, as "development expenses" relating to the Diamond Mine Project, on Schedule C. They also deducted $15,000 as "exploration expenses," in relation to the A & B claims, on Schedule A.

In June 1979, petitioner invested in another program promoted by Erickson and Davis, referred to as the "Gila Mining Project." Smith had also prepared the offering memoranda and associated documents on the Gila Mining Project.

Petitioner visited the Diamond Mine site in Nevada on several occasions during 1979 and through May 1980. In late

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

1979, information came to petitioner's attention that caused him to have doubts about Erickson and Davis. He was surprised to discover that on or about November 7, 1979, a Certificate of Location of Lode Mining Claim had been filed on behalf of certain participants in the Diamond Mine Project, including himself. He inquired of Erickson and Davis about the purpose of the claim and was told that it was part of the Diamond Mountain, an area larger than the Diamond Mine Project. See *Anderson*, 83 T.C. at 905. In or about June 1980, petitioner learned that Erickson had entered into an agreement with third persons under which the third persons would receive 50 percent of the production of the Diamond Mine. Because he believed that under the mining contract with Silver Viking Corp. he and other participants in the Diamond Mine Project owned 50 percent of the production of ore from the Diamond Mine, and Erickson owned 50 percent of the production, petitioner confronted Erickson.

On or about July 29, 1980, petitioner and Erickson, on behalf of Silver Viking Corp., entered into two writings entitled "Points of Understanding" and "Addendum to Mining Contract," in which they agreed that petitioner had a 3.2786885 percent of 50-percent interest in the net production of the Diamond Mine. Those documents were the conclusion of protracted negotiations between petitioner and Erickson. According to petitioner, the purpose of the documents was to clarify petitioner's right to production of ore from the entire Diamond Mountain, to give petitioner a right to inspect various accounting materials and reports of production, and to protect him and other participants from the claims of third persons in the production from the mine. (See *Anderson*, 83 T.C. at 905.) The Addendum to Mining Contract was clarified by a minor correction in a document dated August 5, 1980.

At the end of August 1980, petitioner attended a meeting of the Gila Mining Project investors. At that meeting, Davis stated that Erickson had misappropriated between $400,000 and $1,400,000 from the Gila Mining Project, and that Erickson was incompetent and had never successfully performed a venture in his life. Petitioner met again with Davis in September and October 1980. Smith was also present at the October meeting. At that time, Davis made statements to Smith in petitioner's presence regarding embezzlement of

funds by Erickson. In November 1980, petitioner again met with Smith and Davis. At that meeting, according to Adams' testimony:

Davis disclosed that the Diamond Mine Project had been completely his idea; that he and Erickson had been flying over Nevada and saw the old mine down below, and he suggested that they put together an investment group to do the mine, and that that was the full extent of any geological due diligence that was done on the property.

Q. Excuse me, I didn't hear whether you covered the question. Was any statement made with regard to geological studies of ore reserves?
A. Yes.
Q. What was that statement?
A. That there were no studies.

In November 1982, Erickson was indicted on charges arising out of the charitable contributions program. In the fall of 1984, he was acquitted of those charges.

### Tax Court Litigation

In the fall of 1980, petitioner contacted a law firm in Phoenix with respect to pursuing litigation against Davis, Erickson, and Smith. He sued Davis, but that suit was abandoned after a motion for summary judgment was denied. He did not sue Erickson or Smith.

Petitioner consulted with a tax lawyer at the Phoenix firm, David E. Weiss (Weiss). Weiss declined to represent petitioner in relation to the tax claims because he concluded that it would be a waste of time and money. In October or November 1980, petitioner and Weiss had a telephone conversation with Smith concerning the tax aspects of petitioner's investment in the Diamond Mine Project. Smith advised petitioner and Weiss that Smith was going to pursue his tax remedies, and that petitioner would be able to use Smith's case as a test case. Smith proposed that petitioner pay his pro rata share of out-of-pocket expenses of the litigation. Weiss advised petitioner that, if petitioner litigated the tax deductions claimed in 1978 with respect to the Diamond Mine Project, he would lose. However, petitioner, Weiss, and Smith were under the impression that, if Smith lost his test case, petitioner would still be entitled to secure a settlement with the Internal Revenue Service that would allow him to deduct his out-of-pocket

expenses. Petitioner and Weiss specifically considered whether Smith had a conflict of interest, based on his prior representation of Erickson, but concluded that petitioner should allow Smith to represent him. On or about November 14, 1980, petitioners executed an Internal Revenue Service Form 2848, Power of Attorney, appointing Smith to represent them. Smith represented petitioners with respect to the audit of their tax returns for the years 1978 through 1980.

On January 12, 1982, Smith filed the petition herein on petitioners' behalf. In that petition, among other things, petitioners alleged:

> During the taxable years 1978 and 1979, petitioners engaged in mining operations for profit and incurred expenses in the amounts of $150,000.00 and $224,000.00, respectively, for the development of a mine in which existence of ores and minerals in commercially marketable quantities had been disclosed.

Those allegations for 1978 related to the Diamond Mine Project, and the allegations for 1979 related to the Gila Mining Project.

On more than one occasion after 1980, petitioner and Weiss discussed with Smith the strategy to be pursued by Smith in litigation in the Tax Court over the tax consequences of the 1978 investment in the Diamond Mine Project. Smith's strategy was to limit the trial to a single issue, to wit, the issue set forth in the statutory notice and in the petition as to whether or not the amount claimed was paid "for the development of a mine in which existence of ores and minerals in commercially marketable quantities had been disclosed." Smith believed that he could prevail on that issue and that respondent's counsel would not raise any additional issues. Weiss believed, and advised petitioner, that petitioners would lose on any other issue.

During 1981, 1982, and 1983, Smith filed 16 petitions with respect to the deductibility of amounts purportedly paid in 1978 for "development expenses" of participants in the Diamond Mine Project. Such petitions were filed on behalf of petitioners herein, Smith, Morris E. Anderson and Marlene H. Anderson (Anderson), and Robert K. Clawson and Shirley S. Clawson (Clawson), as well as various other participants. Those petitions were grouped with other "Erickson Mining"

cases and assigned to a single judge for trial or other disposition.

Cases involving Erickson's charitable contributions program, in which taxpayers were represented by counsel other than Smith, were set for trial in Los Angeles, California, on January 4, 1984. Those cases in which taxpayers were represented by Smith were not consolidated with the cases set for trial in Los Angeles and, to that time, no arrangements had been made by which petitioners represented by Smith would be bound by the outcome in the cases set in Los Angeles. Nonetheless, on October 21, 1983, Smith filed a motion for severance and consolidation as separate group on behalf of those taxpayers represented by him, including petitioners. In that motion, Smith stated:

2. Each petitioner is an owner of a separate mining claim located within said mining districts in Eureka County in the State of Nevada.

  *   *   *   *   *   *   *

5. The sole issue in each of the cases set forth above is the deductibility of mining, exploration and development expenses relating to those mining claims which issue is separate and apart from any other cases in which Einar C. Erickson is involved.

6. The case of each petitioner contains identical issues of fact and law which can be handled most economically and expediently through severance and consolidation of these cases from the cases containing unrelated issues.

  *   *   *   *   *   *   *

8. Petitioners will be subject to unnecessary expense and attorney fees as a result of the other unrelated cases containing different and separate issues not involved in the above-captioned cases.

9. Petitioners will be subject to delay and unfair prejudice as a result of the issues contained in the other cases consolidated with the above petitioners.

10. Petitioners have retained the undersigned counsel to represent them regarding the deductibility of their mining expenses with which counsel for petitioners is intimately familiar.

11. Counsel for petitioners represents each member of the Diamond-Excelsior and Silverado-Diamond mining claims and the Court will not be required to deal with different and various counsel with regard to the said claims.

The motion for severance was heard in Phoenix, Arizona, on December 6, 1983. Pertinent portions of the transcript of the hearing are as follows:

THE CLERK: Docket number 13707-81 and related docket numbers, Gennaro Licosati and Margaret Licosati and related petitioners.

MR. SMITH: Wayne Smith, for the Petitioner, Your Honor.

MR. JOHNSON: Robert A. Johnson for Respondent.

THE COURT: Good morning, gentlemen.

I understand yesterday you had a solution to these cases.

MR. JOHNSON: Yes, Your Honor. What we have pretty much agreed to do is because some of the cases are just the development and the exploration expense issue, others are involved with other types of shelter investments and other issues and some of them involve the charitable contribution issue, which I understand you're hearing some cases over in Los Angeles in January, we've agreed to take one or two or a few of the representative samples of the clean cases and just proceed to trial with those and agree between the parties that the other cases on this issue will be bound by the results in those cases.

THE COURT: That's good. That is what I was going to suggest.

Now, when do you think you can have them ready for trial?

MR. SMITH: We're ready now, Your Honor.

If Your Honor is aware, I did file a motion to calendar these cases for January.

THE COURT: Well, we can't put them on the January calendar.

MR. SMITH: I'm aware of that, but I would like to expedite the trial in this case. I don't feel that the taxpayers' best interests are being served by letting these cases drag on.

\*    \*    \*    \*    \*    \*    \*

THE COURT: I'm not sure at this point whether those cases are going ahead in January. We have had some problems with discovery in those cases and it may be necessary to continue them and I'm very anxious to have some of these cases tried too, because there are a lot of petitioners filing additional petitions and I think the issue should be resolved for their benefit.

It's just not feasible to set it upon demand by one party rather belatedly made. That's the problem.

MR. SMITH: Some of these cases are scheduled for an April calendar in Phoenix, Your Honor. I'm not sure which ones.

\*    \*    \*    \*    \*    \*    \*

THE COURT: Then I would think based on my experience in Los Angeles that it would take you that long to work out a stipulation whereby all of your clients agreed to be bound by the results in those cases.

MR. SMITH: Well, I'm in control of all of my clients and I don't anticipate the problems that you're having in Los Angeles, Your Honor.

\*    \*    \*    \*    \*    \*    \*

THE COURT: * * * Mr. Smith, do you need Mr. Erickson's testimony in relation to your cases?

MR. SMITH: Yes, it would be helpful, but it is not imperative. We would be willing to proceed without Mr. Erickson.

THE COURT: All right, you understand the situation now. I assume that respondent's counsel doesn't need Mr. Erickson.

MR. JOHNSON: No, ma'am.

On the basis of the foregoing, the *Anderson* and *Clawson* cases were set for trial in Phoenix commencing April 25, 1984. At the time of trial, an agreement for settlement was filed whereby Smith agreed, on behalf of taxpayers represented by him other than Anderson and Clawson, to be bound by the result in the *Anderson* and *Clawson* cases "on the issue set forth in the pleadings and the notice of deficiency as determinative of the proper treatment of the development expenses, with respect to the Silverado claims." (See *Anderson*, 83 T.C. at 906.) This agreement was consistent with the trial strategy agreed upon among Smith, petitioner, and Weiss.

On April 5, 1984, Smith wrote a letter to petitioners in which he stated "As you are aware, the Tax Court has set the 'Diamond Mine' case for trial in Phoenix, Arizona, commencing April 25, 1984." Smith requested a contribution of $1,000 per claim to defray the legal fees and costs attributable to the trial and stated:

Investors who do not contribute by April 25, 1984 will not be represented by me in the trial of the case and the Internal Revenue Service will not be bound by the Court's decision as it relates to that investor's claimed deduction.

If you have any questions regarding the contents of this letter or the trial, please contact me.

Petitioner received the letter from Smith, but he made no response to the letter. On June 11, 1984, Smith filed a petition in this Court's docket No. 17805–84, on behalf of petitioners with respect to the taxable year 1980.

On August 27, 1984, Smith wrote another letter to petitioner. That letter stated as follows:

As you are aware, the "Diamond Mine" case was tried before the U.S. Tax Court during April. I have recently filed an opening brief on behalf of the petitioners, a copy of which is enclosed for your information.

As I explained in my letter to you of April 5, 1984, trying this case was expensive and time consuming. The legal fees and out-of-pocket expenses accrued in this matter through July 31, 1984, total $18,672.64. A detailed statement which itemizes the fees and costs is enclosed. I am requesting that

each investor contribute his pro-rata share of said fees and costs. I have represented investors owning 13.5 "Diamond Mine" claims and, therefore, each investor's pro-rata share is $1,383.16 per claim. Since you are the holder of one and one-half claims, your share of the legal expenses is $2,074.74. We have received no payments from you in response to our previous request. Please remit $2,074.74 as soon as possible, as I will not be able to continue to represent those investors who do not pay their share of these expenses.

If you have any questions regarding this letter or the trial, please do not hesitate to contact me.

Upon receipt of that letter, petitioner contacted Weiss.

Petitioners learned no later than October 1984 that Smith had entered into the agreement for settlement. Petitioner obtained a copy of respondent's brief in *Anderson* and provided it to Weiss. Weiss became concerned on reading that brief, particularly because of the discussion of the failure of Anderson or Clawson to conduct any investigation into the bona fides of the Erickson program. Petitioner was advised to consider suing Smith for malpractice, but he did not do so. Smith was still representing petitioner in his mining investment tax matters.

In late November or early December 1984, Weiss called the Court and orally expressed an intention to bring a motion to be relieved of the settlement agreement. Weiss was advised to await the opinion of the Court in *Anderson*, which was filed December 5, 1984.[2]

On February 4, 1985, petitioners filed the motion for relief from agreement for settlement that we are considering here. In that motion, they allege that Smith was not authorized to enter into the agreement for settlement, and that they were unaware of the terms thereof and not given an opportunity to authorize or reject them. Petitioners further allege that Smith did not represent their interests because of his conflict of interest, i.e., his prior representation of Erickson and his "prominent role in inducing the petitioner to invest in the project." They claim that because of this conflict of interest, Smith failed to raise an alternative theft-loss issue for 1979 or 1980.

---

[2]This fact is set forth only to avoid any implication that petitioners decided to bring the motion only after the Court's ruling in *Anderson*.

## OPINION

In their post-hearing brief, petitioners describe the purpose of their motion as follows:

At the conclusion of the hearing [of the motion], the Court inquired whether petitioners intend to relitigate the issues decided in the Anderson and Clawson cases if the instant motion is granted. Petitioners hereby reiterate the representation made by the undersigned in open court that they have no such intention. Their exclusive motivation and intention is to secure the same settlement terms from respondent which would be available to any similarly situated taxpayers who invested in tax shelters in 1980 or prior years and have not yet tried their cases. * * *

Petitioners ask the Court to relieve them from the agreement entered into by their counsel of record and, in effect, to reinstate a claim that they do not intend to litigate. Even if we had the authority or power to impose a settlement position on a party, we find no equity in this case that would justify exercise of that authority or power.

Petitioners have also stated the issue as:

The ultimate issue to be resolved in ruling on this motion is whether the client who authorizes an attorney to file a Tax Court petition can and should be held accountable for any actions thereafter taken by the attorney in such case regardless of whether those actions violate the A.B.A. Code of Professional Responsibility and thus Rule 201(a) of the Court's Rules of Practice.

We think that this statement is overly broad, and we decide only whether Smith had authority to enter into the agreement in issue; whether his apparent conflict of interest is a ground for relief from that agreement; and what criteria should be used in ruling on a motion to be relieved of such an agreement.

### Authority

The term "agreement for settlement" in this case is essentially a misnomer, because the agreement did not settle or compromise petitioners' claim but merely prescribed a procedure whereby that claim would be adjudicated. Smith, as attorney of record, had full authority to decide on procedural steps to be taken in the litigation. Long ago the Supreme Court said:

When an attorney has been retained he has certain implied powers to act for his client, in a suit actually commenced, in the due and orderly conduct of the case through the courts. In cases of suits actually pending he may agree that one suit shall abide the event of another suit involving the same question, and his client will be bound by this agreement * * * [*Stone v. Bank of Commerce*, 174 U.S. 412, 422 (1899).]

See 7 Am. Jur. 2d, Attorneys At Law, secs. 149–150, at 206–207 (1980).

Because of the label attached to the agreement in this case by the parties, however, we will assume that this is not a case where authority would be implied. We will, therefore, make a factual determination of whether Smith was acting within the scope of his actual or apparent authority. See *Harrop v. Western Airlines, Inc.*, 550 F.2d 1143 (9th Cir. 1977); *Arizona Title Insurance & Trust Co. v. Pace*, 8 Ariz. App. 269, 445 P.2d 471 (1968).

Petitioner, after consultation with Weiss and express consideration of a possible conflict of interest and with knowledge that his tax claims probably had no merit, employed Smith to represent him in the audit of the years 1978, 1979, and 1980, and to file two petitions in this Court. To the extent that petitioner, Weiss, and Smith purported to agree that petitioners' case would be held in abeyance and never be tried because of the doubts as to its merit, they would be agreeing to limit the authority Smith would normally have as counsel of record. Such agreement would seem to abuse the process of this Court, to usurp the Court's control over its calendar, and otherwise to be contrary to sound public policy.

The administration of justice is not a subject to be controlled by contract, and the courts are agreed that agreements which have a tendency to obstruct, impede, or interfere with the administration of justice are contrary to public policy. All agreements relating to proceedings in the courts, civil or criminal, which may involve anything inconsistent with the full and impartial course of justice therein are void, even though they are not open to the charge of actual corruption. This is true regardless of the good faith or intent of the parties at the time the contract was entered into, or the fact that no evil resulted by or through the contract. In other words, all agreements for pecuniary consideration to control the regular administration of justice are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. Such agreements are evil in their tendency and therefore it is the policy of the law to discourage them by consistently holding them void. [17 Am. Jur. 2d, Contracts, sec. 193, at 563–564 (1964); fn refs. omitted.]

See also 7 Am. Jur. 2d, Attorneys At Law, sec. 196, at 246 (1980). Such an agreement is certainly not one that we would readily enforce.

In any event, from the evidence it appears that the agreement entered into with respondent by Smith was consistent with the strategy chosen by petitioner, Weiss, and Smith. They originally discussed a "test case" procedure, although Smith may have indicated that his own case would be the test case. Smith later moved to set all cases, including petitioners', for trial in January 1984, a step that was within his apparent authority as counsel of record. He expressly represented that he had "control of [his] clients" in dealing with the Court and with respondent, and petitioners clearly put him in the position to make those representations.[3]

Moreover, petitioners were put on notice by Smith's letters of April and August 1984, although not necessarily completely or accurately, of the procedures that had been adopted. It was not the procedure that caused them to make the present motion, but what Weiss read in respondent's brief about the testimony given at trial of the *Anderson* and *Clawson* cases. At this point, they decided that Smith had used poor judgment in choosing the "test cases" because neither Anderson nor Clawson had independently investigated the Erickson ventures to the extent that petitioner in this case had. Such investigation, however, had no bearing on the issue to which the trial was, according to their strategy, to be limited, i.e., the existence of ores in commercially marketable quantities. We infer that after reading respondent's brief, petitioner and Weiss merely realized that Smith had not been effective in the strategy voluntarily adopted among petitioner, Smith, and Weiss. Only then did they do anything to advise respondent's counsel or the Court that Smith purportedly lacked authority.

Thus we conclude that Smith had actual and apparent authority to enter into an agreement in all material respects equivalent to the agreement for settlement in issue here. Even if he did not have actual authority, his actions would be

---

[3] We find incongruous petitioners' present contention that we should act to relieve petitioners of the consequences of their employment of counsel because Smith is "an officer of the Court." His responsibility to the Court is something that may be dealt with in an appropriate proceeding. Petitioners, however, are "in pari delicto" to the extent that any misconduct by Smith was known to and consented to by them.

binding on petitioners. *Arizona Title Insurance & Trust Co. v. Pace, supra.* See *Senate Realty Corp. v. Commissioner*, 511 F.2d 929, 932–933 (2d Cir. 1975); *Brooks v. Driscoll*, 114 F.2d 426, 428–429 (3d Cir. 1940). Cf. *Flood v. Commissioner*, 468 F.2d 904 (9th Cir. 1972).

## Conflict of Interest

Petitioners contend that Smith was precluded from acting on their behalf because of the conflict of interest arising out of his prior representation of Erickson and his own involvement in preparing the documents used to reflect petitioner's participation in the Erickson program. All of the relevant facts, however, were known to petitioners and to their independent counsel, Weiss, prior to the filing of the petition herein.

Petitioners complain that Smith failed to make a theft loss claim on their behalf in 1979 or 1980 because of his loyalty to Erickson. Assuming that to be true, petitioners' remedy is to move to amend the respective petitions as to those years. As respondent concedes, nothing in the Court's opinion in *Anderson* constitutes a holding as to claims made in years other than 1978.

Smith's apparent conflict of interest arises from his necessity of vindicating himself as to the representations he may have made to petitioners before they entered into the transactions in 1978 as well as from his representation of Erickson in those transactions. See A.B.A. Model Rules of Professional Conduct, rule 1.7(a). Petitioner testified that he believed that he acquired an interest in the Diamond Mine through those agreements drafted by Smith. As we held in *Anderson*, however, those documents did not give him any interest in the Diamond Mine but only an interest in a claim to be staked by Erickson in the future. Petitioner here claims that he was surprised when notified by Erickson in late 1979 that a claim had been staked on his behalf. The express terms of the agreement that petitioner signed, however, were that Erickson would locate a new claim and that there was no joint venture relationship between Erickson and the participants in his program. See *Anderson*, 83 T.C. at 910–911.[4]

----

[4]The evidence in this case as to the agreements entered into in 1980 supports the conclusion in *Anderson v. Commissioner*, 83 T.C. 898 (1984), on appeal (9th Cir., Mar. 5, 1985), that self-serving

Alternatively, in defense of his failure to secure for the participants the contractual rights that petitioner thought he had, Smith might assert that the participants were interested only in the desired tax consequences and, therefore, were not damaged by the failure to obtain economic results to which they were indifferent. Thus a defense by Erickson and Smith to potential nont⁻ ⁻ claims of the participants would necessarily undermine the positions Smith was maintaining on behalf of the participants in this Court.

Petitioners rely on *Wilson v. Commissioner*, 500 F.2d 645 (2d Cir. 1974), revg. a Memorandum Opinion of this Court, in which we were directed to hold an evidentiary hearing in which a taxpayer, seeking relief from a settlement agreement entered into by counsel who had a conflict of interest, might explain her failure to seek the advice of independent counsel. After holding such a hearing, we found that the conflict of interest was unknown to the petitioner. In *Wilson v. Commissioner*, T.C. Memo. 1976–285 (35 T.C.M. 1276, 1278, 45 P–H Memo T.C. par. 76,285, at 1256–76), we stated:

Ordinarily such naivete would not be sufficient grounds for reopening a case on the basis of lack of adequate representation by counsel. See *Coussement v. Commissioner*, 391 F.2d 227 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; *Chiquita Mining Co. v. Commissioner, supra*; *Crane-Johnson Co. v. Commissioner*, 105 F.2d 740 (8th Cir. 1939), affg. 38 B.T.A. 1355 (1938), affd. 311 U.S. 54 (1940). However, in the instant case we are presented with a situation in which petitioner's counsel * * * also represented a co-petitioner * * * whose interests were inconsistent with those of petitioner. * * *

The *Wilson* case is distinguishable on several grounds. Petitioner here was a sophisticated businessman; he had knowledge of the conflict of interest; and he consulted independent counsel. Although petitioner and Weiss testified that they believed there would be no conflict if Smith pursued only his own case, we are unimpressed by this reasoning. Smith's interest was to make arguments, in whatever case, that would promote the Erickson program participants' tax claims while protecting Smith against claims by those who relied on his

---

reports rendered by Erickson in 1981 or 1982 were not reflective of the contracts entered into in 1978. It now appears that those reports and evidence of accountings rendered by Diamond-Treasure Hill, Inc., related to the 1980 agreements negotiated when petitioner discovered that he did not have a right to production from the entire Diamond Mountain.

advice. In *Wilson,* the tax positions of the two parties represented by one counsel were irreconcilable in that the husband benefited from one and the wife benefited from another. Here, the *tax* positions of the parties represented by Smith were parallel, if not identical. See generally *Alexander v. Superior Court,* 141 Ariz. 157, 685 P.2d 1309, 1315 (1984). We conclude, therefore, that Smith's conflict of interest is not a ground for setting aside the agreement in this case.

## *Criteria for Ruling on Motion*

Petitioners' present motion was brought before entry of decision in this case and while other related and unrelated issues remained unresolved. Petitioners contend, therefore, that cases in which a Court refused to vacate a final judgment do not provide the relevant criteria. Specifically, they contend that they are not required to show a "fraud on the Court." Respondent does not dispute this contention and agrees that the Court has discretion to set aside the agreement in this case.

Petitioners also contend that the agreement should not be enforced in this case because, according to petitioners, the Court was under the misapprehension that all of the cases dealt with by the agreement for settlement were "clean cases," i.e., cases not involving issues other than deductibility under section 616 of development expenses allegedly incurred in 1978. Petitioners' position on this point is without support in fact or reason.[5] The *Anderson* and *Clawson* cases were selected, as set forth in the above-quoted portions of the transcript of hearing of December 6, 1983, because *they* did not involve issues other than developmental expenses. The obvious implication of those discussions was that other cases were not suitable because they involved other issues, but that progress in resolving issues could be made by the procedure agreed to by Smith on behalf of all of his clients.

Appropriate criteria to apply to petitioners' present motion may be found in cases dealing with attempts to modify a pretrial order under rule 16, Federal Rules of Civil Procedure

---

[5]Petitioners' motion and the supporting memoranda contain several misstatements about the procedural history of these cases. We do not, however, attempt to correct each of them.

(FRCP 16).[6] The *Anderson* and *Clawson* cases were set for trial by Court order on the basis of the representations of counsel and the procedure agreed to on December 6, 1983. The purpose of the agreement for settlement, comparable to that of a FRCP 16 order, was to narrow issues for trial and to resolve triable issues in an efficient manner. A FRCP 16 order may be modified "to prevent manifest injustice." The party seeking modification, however, must show that the failure to allow the modification might prejudice him. *Angle v. Sky Chef, Inc.*, 535 F.2d 492, 495 (9th Cir. 1976). Discretion should be exercised to allow modification where no substantial injury will be occasioned to the opposing party; refusal to allow modification might result in injustice to the moving party; and the inconvenience to the Court is slight. *Angle v. Sky Chef, Inc.*, *supra*, quoting *Sherman v. United States*, 462 F.2d 577, 579 (5th Cir. 1972); *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27–28 (9th Cir. 1980).

The injury to respondent and inconvenience to the Court in reopening the questions tried and decided in *Anderson* are obvious. Cf. *Brooks v. Commissioner*, 82 T.C. 413, 429–430 (1984), on appeal (9th Cir., Dec. 19, 1984). More compelling, however, is petitioners' failure to show that they are prejudiced in any cognizable way.

Petitioners claim prejudice in that respondent now refuses to settle by allowing them a deduction for their out-of-pocket expenses incurred in 1978. They have presented no theory, however, under which they could prevail if that issue were tried. Petitioners claimed that they were entitled to deduct $150,000, consisting of $30,000 in cash and a $120,000 nonrecourse note, under section 616. That section requires a showing that the expenditures be paid or incurred "after the existence of ores or minerals in commercially marketable quantities has been disclosed." We found in *Anderson*, however, that the agreement executed by petitioners in 1978 expressly gave them only a right to have Erickson locate and stake for them a claim. In this case, as in *Anderson*, Erickson performed

---

[6] Rule 1(a), Tax Court Rules of Practice and Procedure, provide in part as follows:

"Where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand."

that service no sooner than 1979. The services described in the agreement were more in the nature of expenses to ascertain the existence, location, extent, or quality of any deposit of ore or other mineral, which may be deducted, rather than capitalized, only if an election, subjecting the taxpayer to certain recapture provisions, is made under section 617.[7] No such election was made with respect to the expenses in issue here. Moreover, because section 617 is intended to cover services before the development stage has been reached (sec. 1.617–7, Income Tax Regs.), its theory is totally inconsistent with petitioners' claim under section 616. Thus, the only theory under which petitioners would be entitled to deduct their "out-of-pocket" $30,000 paid to Erickson would be the theft-loss theory; but such claim would have to be made in a subsequent year and is not precluded by the agreement for settlement.

Petitioners have affirmatively asserted that they do not intend to litigate their entitlement to the deductions in issue here. Thus they have, in effect, admitted that they do not intend properly to prosecute the case, at least as to that issue. On the entire record, we conclude that there is no injustice in holding them to the agreement made by Smith as their counsel of record. Their motion will, therefore, be denied.

*An appropriate order will be issued.*

---

[7]See also *Baxter v. Commissioner*, T.C. Memo. 1985–415.