T.C. Memo. 2005-76

UNITED STATES TAX COURT

JOHANN KEIL AND CATHERINE KEIL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15206-02.                    Filed April 7, 2005.

        In the summer of 2000, Ps, H and W, retained an
attorney, M, to represent them as to their 1993 and
1994 income taxes.  W was M's contact person for Ps,
and W specifically told M at the time of his retention
that he could not accept any settlement that affected
Ps without her consideration and approval of it.  On
Dec. 9, 2003, M settled approximately 45 out of 50
issues in the case; M did not first seek or receive the
approval of either P.  One day later, M signed and
caused to be filed with the Court a stipulation of
settled issues (first stipulation of settled issues)
that described the terms of this settlement.  Neither P
was aware that M had settled these issues nor that he
had filed the first stipulation of settled issues, and
neither P authorized either of these acts.  On or
before Dec. 14, 2003, M settled the remaining five
issues, without seeking or receiving the approval of
either P.  After the latest settlement, M contacted W
to obtain her acceptance of both settlements without
telling her that he had already accepted them on behalf

of Ps.  W declined to accept the settlements.  On Dec. 15, 2003, M called H to attempt to persuade H to accept the settlements on behalf of Ps, without telling H that M had already accepted both settlements on behalf of Ps.  H declined to accept the settlements. Afterwards, through Dec. 17, 2003, M spoke separately to W and H on a number of occasions in an attempt to persuade either of them to accept the settlements. Neither P ever did so.  On Jan. 14, 2004, unbeknownst to Ps, M caused to be filed with the Court a settlement stipulation that showed Ps' 1993 and 1994 Federal income tax liability, as computed on the basis of the settlements.  On Jan. 27, 2004, the Court entered a stipulated decision that reflected the amounts shown in the settlement stipulation.  In February 2004, Ps moved the Court to vacate the stipulated decision and to set aside the related stipulations of settlement.  Ps asserted in their motion that M was unauthorized to agree to the settlements on their behalf.

Held:  The Court shall grant Ps' motion in that we find that M was not authorized by Ps to agree to either settlement on their behalf.

Michael D. Stewart, Ronald A. Feuerstein, Candace M. Van den Bosch, and Gary H. Kuwada, for petitioners.[1]

Elliot H. Kajan, for third party in interest Dwight M. Montgomery.

Karen Nicholson Sommers, for respondent.

---

[1] Dwight M. Montgomery petitioned the Court on behalf of petitioners and continued to represent them until he withdrew on Apr. 9, 2004.  Ronald A. Feuerstein entered the case on Feb. 25, 2004.  Candace M. Van den Bosch and Michael D. Stewart entered the case on Apr. 28, 2004.  A. Lavar Taylor and Robert S. Horowitz entered the case on June 9, 2004, and withdrew on July 15, 2004.  Gary H. Kuwada entered the case on June 22, 2004.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioners petitioned the Court to redetermine deficiencies of $862,621 and $1,528,818 in their Federal income taxes for 1993 and 1994, respectively, and related additions thereto totaling $389,285 and $688,169, respectively. On December 10, 2003, the parties filed with the Court a stipulation of settled issues (first stipulation of settled issues) that stated the terms of a settlement (first settlement) of approximately 45 out of 50 issues in the case.  Six days later, respondent lodged with the Court a second stipulation of settled issues (second stipulation of settled issues) that repeated the substance of the first stipulation of settled issues and stated the terms of a settlement (second settlement) of the five issues which were not previously settled.  On January 14, 2004, the parties filed with the Court a settlement stipulation that showed petitioners' income tax liability (inclusive of any addition thereto) for 1993 and 1994, as computed on the basis of the first settlement and the second settlement (collectively, settlements).  On January 27, 2004, the Court entered a stipulated decision that reflected the amounts shown in the settlement stipulation.

On February 27, 2004, petitioners moved the Court to vacate the stipulated decision and to set aside the related stipulations of settlement.  Petitioners asserted in their motion that their

former counsel, Dwight M. Montgomery (Montgomery), was unauthorized to agree to the settlements on their behalf.[2] Following an evidentiary hearing on petitioners' motion, we decide whether to vacate the stipulated decision and to set aside the related stipulations of settlement. We hold that we shall.

## FINDINGS OF FACT

Some facts were stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. Petitioners attached certain documents to their opening brief as an appendix. These documents and the statements therein are not evidence. We give these documents and statements no consideration except to the extent that they are duplicative of a document or statement otherwise in evidence. See Rule 143(b);[3] see also Harris v. Commissioner, T.C. Memo. 1998-332 (documents attached to a brief are not evidence).

Petitioners, husband and wife, resided in San Juan Capistrano, California, when their petition was filed. During 1993 and 1994, they worked in a business that provided physical, occupational, and speech therapy services to nursing homes.

---

[2] Although this motion was filed as a motion to vacate the decision, we understand and treat it as a request by petitioners to vacate the stipulations of settlement as well.

[3] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years. Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners' S corporation, Continuum Health, Inc. (Continuum), exercised daily management functions and operated the business. Petitioners' wholly owned C corporation, Continue Care Corporation (CCC), processed the business's payroll. Petitioner Catherine Keil (Ms. Keil), a licensed physical therapist, handled the business's daily operation and finances. Ms. Keil also dealt with the business's accountants and lawyers. Petitioner Johann Keil (Mr. Keil) handled the business's development and public relations. Mr. Keil had no involvement in the business's daily operation.

In or around 1999, respondent audited petitioners' personal 1993 and 1994 Federal income tax returns and the related returns of Continuum and CCC. Through a referral, Ms. Keil met Montgomery in the summer of 2000, and petitioners and CCC retained him to handle the audits. Ms. Keil was Montgomery's contact person for petitioners as to this representation, and she informed him at the time of his retention that he could not accept any settlement as to the case without her consideration and approval of it. Until December 15, 2004, Montgomery dealt exclusively with Ms. Keil as to the subject matter of the audits. His only interaction with Mr. Keil before December 15, 2004, was that they spoke with each other on several occasions in October 2004 about an unrelated matter concerning a nonprofit foundation.

Montgomery instructed Ms. Keil to forward to him any tax-related document that she received as to the subject years, and he told her that he would take care of those documents. On November 21, 2000, respondent mailed to Ms. Keil a notice of deficiency determining a $518,939 deficiency in CCC's 1994 Federal income tax and related additions thereto totaling $233,522.55. She forwarded that notice to Montgomery, and he petitioned the Court with respect to it. On July 13, 2001, the Court dismissed CCC's case as untimely filed. Montgomery never told Ms. Keil that CCC's case was dismissed. Approximately 6 weeks before that dismissal, Montgomery had noted that the Court's dismissal of CCC's case as untimely filed would cost CCC approximately $1.2 million to litigate its case in a U.S. District Court.

On June 25, 2002, respondent issued to petitioners the notice of deficiency as to their 1993 and 1994 Federal income taxes. As to those respective years, the notice determined income tax deficiencies of $862,621 and $1,528,818, section 6651(a)(1) additions to tax of $216,761 and $382,405, and section 6662(a) accuracy-related penalties of $172,524 and $305,764. On or about September 22, 2002, petitioners authorized Montgomery to petition the Court with respect to this notice. On September 26, 2002, Montgomery filed such a petition with the Court, seeking a redetermination of unreported income, business expenses, personal

deductions, additions to tax under section 6651(a), and accuracy-related penalties under section 6662(a). The Court calendared the resulting case for trial on the Court's regular 2-week session in San Diego, California, commencing on October 20, 2003 (regular San Diego session), and notified the parties of this action on May 22, 2003. Montgomery did not prepare to try petitioners' case at the regular San Diego session but assured Ms. Keil that he would cause the case to be continued until the spring of 2004. Early in October 2003, Ms. Keil called Montgomery to ask him about the scheduled trial, and she inquired into whether he was going to prepare petitioners for it. He reiterated that he was going to have the case continued, and he asked Ms. Keil to give him a good reason to continue the case. He added that the case was not ready to be tried during the regular San Diego session.

Pursuant to Montgomery's request, petitioners presented him with a two-sentence letter from a medical doctor stating that "I am treating Mr. Keil for an episode of Major Depression. He is being treated with an antidepressant, Paxil, and cognitive psychotherapy". Montgomery attached this letter to a motion for continuance. In relevant part, he asserted in that motion that Mr. Keil was suffering from depression and that Mr. Keil was critical to petitioners' case because he was more actively involved with the business's income and expenses than was Ms.

Keil.  Montgomery filed that motion with the Court at the call of the calendar of the regular San Diego session.  The Court denied this motion and informed the parties' counsel that petitioners' case would be tried during the second week of the regular San Diego session.  Montgomery told Ms. Keil that this motion was denied.  He did not tell her that petitioners' case was set for trial during the second week of the regular San Diego session.

Near the end of the first week of the regular San Diego session, the Court concluded that wildfires in the San Diego area could be dangerous during the remainder of that session.  On October 27, 2003, the Court sua sponte continued the trial of petitioners' case to December 16, 2003, and notified the parties of the same.  On November 28, 2003, Montgomery filed with the Court a motion to continue petitioners' case from December 16, 2003, asserting that he would be outside the United States on a family vacation during that time.  Montgomery informed Ms. Keil that this motion would be granted, and she and Mr. Keil made separate plans to be in the States of Hawaii and Washington, respectively, over the new trial date.  The Court denied Montgomery's motion on December 1, 2003.  Montgomery never informed petitioners of this action, and petitioners traveled pursuant to their plans.

Subsequently, Montgomery and respondent settled all issues in the case before December 16, 2003.  They filed the first

stipulation of settled issues on December 10, 2003, that reflected their settlement of approximately 45 out of 50 issues. The first stipulation of settled issues stated that the only issues remaining in dispute were (1) whether petitioners could deduct for 1993 contract labor in excess of $463,577, (2) whether Continuum (and thus petitioners) could deduct business expenses for 1994 in excess of $871,480, (3) whether petitioners could deduct for 1994 a stock loss under section 1244 as to Quest Therapy, Inc. (Quest), (4) whether petitioners were liable for the section 6662(a) accuracy-related penalty determined by respondent for 1993, and (5) whether petitioners were liable for the section 6662(a) accuracy-related penalty determined by respondent for 1994. Montgomery did not inform either petitioner that he had agreed to and signed the first stipulation of settled issues on December 9, 2003, or that he had caused it to be filed with the Court the next day, nor did either petitioner expressly authorize him to do any of those acts. On or before Sunday, December 14, 2003, without seeking or receiving the approval of either petitioner, Montgomery settled the five remaining issues.

Afterwards on December 14, 2003, Montgomery called Ms. Keil in Hawaii to obtain her acceptance of the settlements. He told her that the settlements were a "proposal" that she need not accept but, if she declined to do so, that petitioners would have to try their case in the spring of 2004. Ms. Keil did not accept

the "proposal" because she did not understand it. She told Montgomery that this was so and that she wanted to discuss the "proposal" with her accountant, Joann Ong Tan (Tan), before acting on it. Montgomery asked Ms. Keil if he could talk to Mr. Keil about the "proposal". Ms. Keil replied that the matter was between her and Montgomery, and she reminded him that she had to agree to any settlement on her part. She also told him that she might not necessarily agree with a settlement accepted by Mr. Keil. Following this conversation, Montgomery transmitted to Ms. Keil in Hawaii an 18-page facsimile that included an unsigned copy of the second stipulation of settled issues and Montgomery's analysis of the terms of that second stipulation. He also at or about that time transmitted by facsimile to Tan the same 18 pages, but for a slight change in the message on the cover sheet and an alteration or deletion of a paragraph concerning payment concerns, and he stated on the cover sheet addressed to her that the second stipulation of settled issues represented a "proposed IRS settlement". Also on December 14, 2003, petitioners discussed with each other the status of the case and, more specifically, the facsimile that Ms. Keil had received from Montgomery. Mr. Keil expressed no opinion on the second stipulation of settled issues but stated that he wanted an accountant first to review it. At or about the same time, Ms. Keil also spoke by telephone with Tan and explained that

respondent had made a "proposal" to petitioners. Ms. Keil asked Tan to review Montgomery's analysis of the "proposal" and to discuss it with her.

On December 15, 2003, Montgomery spoke for the first time with Tan. Later that day in the evening, Montgomery spoke with Tan a second time for at least 2 hours. During the later call, Montgomery and Tan discussed the second stipulation of settled issues and Montgomery's analysis of it. During no time on that date (or at any other time) did Montgomery inform Tan that he had already accepted the settlements on behalf of petitioners, or that he had signed the first stipulation of settled issues approximately 1 week before.

Also on December 15, 2004, before he had spoken to Tan in the evening of that day, Montgomery called Mr. Keil in Washington to attempt to persuade him to accept the settlements on behalf of petitioners. The two spoke for approximately 25 minutes, with Montgomery referring to the second stipulation of settled issues as a "proposal" and recommending that Mr. Keil accept it. Mr. Keil responded that he first wanted the "proposal" to be reviewed by an accountant. In an attempt to persuade Mr. Keil to accept the second stipulation of settled issues at that time, Montgomery stated that his law firm would remedy any error reflected in that stipulation, if one in fact existed. When Mr. Keil continued to resist, Montgomery threatened to resign as petitioners' counsel

unless Mr. Keil accepted the settlements. Mr. Keil did not accept any part of the settlements, and he did not instruct Montgomery to settle any part of the case on behalf of either petitioner. Nor did Mr. Keil tell Montgomery that Mr. Keil would get Ms. Keil to accept the second stipulation of settled issues.

On the morning of December 16, 2003, Montgomery spoke to Tan briefly and concluded their conversation by stating that he had to go to court. When this case was called for trial at 10 a.m., on December 16, 2003, neither Montgomery nor petitioners were present. Respondent's counsel, Karen Nicholson Sommers (Sommers), appeared on behalf of respondent and informed the Court that she had spoken to Montgomery that morning. She stated that Montgomery had told her that he would be transmitting to her office by facsimile a signed stipulation that reflected their resolution of all issues in the case. She stated that she had recently verified that this document was then in her office. She informed the Court that the parties had settled all issues in the case but that Montgomery had told her that he would like 30 days to file the settlement stipulation so that petitioners' accountant could review the tax computations shown therein.[4] The

_____

[4] As we understood it then and continue to understand it today, the accountant's review related only to the calculation of petitioners' tax liability that would be shown in the settlement stipulation; the accountant's review was not a contingency to the settlement of any of the issues underlying that stipulation. To be sure, the settlement stipulation, set forth infra pp. 16-17,
(continued...)

Court granted this request and again confirmed with Sommers that the parties had resolved all issues arising out of the notice of deficiency issued to petitioners. Respondent at that time also lodged with the Court a signed (by Montgomery and Sommers) copy of the second stipulation of settled issues. The second stipulation of settled issues was generally a copy of the first stipulation of settled issues modified to state the terms of the settlement of the five issues which were listed in the first stipulation of settled issues as then still in dispute. The lodged document stated as to these five issues that (1) for 1993, petitioners could deduct $158,320 of contract labor in excess of the $463,577 referenced in the first stipulation of settled issues (i.e., a total deduction of $621,897), (2) for 1994, Continuum (and thus petitioners) could not deduct any business expenses in excess of the $871,480 referenced in the first stipulation of settled issued, but that Continuum (and thus petitioners) had to realize additional income of $225,411, (3) for 1994, petitioners could not under section 1244 deduct any stock loss as to Quest, (4) for 1993, petitioners were liable for the section 6662(a) accuracy-related penalty, and (5) for 1994,

---

[4](...continued)
merely states the amount of petitioners' tax liability for the relevant years and makes no mention of any specific issue underlying that liability. The parties' settlement of the issues underlying the settlement stipulation, on the other hand, was set forth in the first stipulation of settled issues and the second stipulation of settled issues.

petitioners were liable for the section 6662(a) accuracy-related penalty.

During the afternoon of December 16, 2003, Montgomery held a telephonic conference with Ms. Keil and Tan, and he tried to persuade Ms. Keil to accept the settlements. He told Ms. Keil and Tan that if they later found any mistake in his computations, his law firm and his insurance carrier would pay for the mistake, the accounting fee, and the tax bill. Ms. Keil refused to accept the settlements.

Near the end of this conference, Montgomery asked Tan to hang up so that he could speak privately with Ms. Keil. After Tan did so, Montgomery asked Ms. Keil if she was proceeding with her plans to divorce Mr. Keil. Ms. Keil replied that she was and that Mr. Keil would be served with divorce papers in January 2004. Montgomery replied that the divorce was good news in that either petitioner alone could now settle petitioners' case and then, if either petitioner wanted, argue later that the resulting decision should be vacated because neither petitioner was entitled to settle on behalf of both petitioners due to their pending divorce. Montgomery suggested that he (on her behalf) could then accept the settled amount or see if he could get a better deal. Ms. Keil declined this offer. Later that evening, Montgomery spoke to Tan for approximately 2 hours. Montgomery relayed to Tan his scheme of filing with the Court a stipulated

decision authorized by only one petitioner, believing that petitioners could later attack it as improperly authorized by only one of them while they were undergoing a divorce.

At midnight of that evening, Montgomery called Tan again and spoke to her for 3 hours trying to convince her that the settlements were good for petitioners. Tan did not have any of petitioners' 1993 or 1994 financial records, and she told Montgomery that she required those records before opining on the settlements. During the morning of December 17, 2003, Montgomery drove approximately 2 hours to Tan's office to hand deliver petitioners' files to her and to discuss the settlements. He met with Tan from approximately 11 a.m. to 4 p.m. Tan informed Montgomery at the end of that meeting that she still was unable to opine on the settlements because she was uncomfortable with the accuracy of certain numbers used by his accountant in computing amounts reflected in the settlements. Montgomery told Tan not to worry because his insurance carrier would cover any expense resulting from an inaccurate computation by him or his accountant. Tan continued to decline to opine at that time.

Also on December 17, 2003, Montgomery spoke to Mr. Keil for approximately 10 minutes. During that call, Montgomery again tried to convince Mr. Keil to approve the settlements and stated that any mistake in them would be remedied by his law firm. Mr. Keil declined to accept the settlements. Montgomery informed Mr.

Keil that petitioners could review the settlements with Tan while Montgomery was away on vacation and that he and petitioners could then discuss the settlements when he returned in January 2004.

On December 18, 2003, Montgomery left the United States on his scheduled vacation. After he returned, he signed both the settlement stipulation and the stipulated decision on January 6, 2004. After he returned to the United States, he did not first talk to either petitioner or Tan as to the matter. Sommers signed both of those documents on January 13, 2004, and the parties filed the settlement stipulation with the Court on January 14, 2004. The settlement stipulation stated:

> It is hereby stipulated that the following statement shows petitioners' income tax liability for the taxable year 1993:

| | |
|---|---|
| Tax Liability, computed without allowance for net operating loss carryback from taxable year 1995 to taxable year 1993 | $168,045.00 |
| Tax assessed: | <u>$64,718.00</u> |

| Payments | | |
|---|---|---|
| (April 15, 1994) | $20,500.00 | |
| (April 15, 1995) | $ 1,751.00 | |
| (November 28, 1997) | $ 5,000.00 | |
| (January 22, 1998) | <u>$ 5,000.00</u> | |
| Paid | $32,251.00 | |
| Not paid | $32,467.00 | |

| | |
|---|---|
| Deficiency, without allowance for net operating loss carryback | $103,327.00 |
| Reduction-in liability due to net operating loss carryback | <u>$86,904.00</u> |

Deficiency, after allowance for net
  operating loss carryback                <u>$16,423.00</u>

No net operating loss carryback claim filed.

     It is further stipulated that there is a
deficiency in income tax due from petitioners for the
taxable year 1994 in the amount of $238,769.00.

     It is further stipulated that there are additions
to tax due from petitioners for the taxable years 1993
and 1994, under the provisions of I.R.C. § 6651(a)(1),
in the amounts of $25,831.75 and $47,869.80,
respectively.

     It is further stipulated that there are penalties
due from petitioners for the taxable years 1993 and
1994, under the provisions of I.R.C. § 6662(a), in the
amounts of $20,665.40 and $47,753.80.

     It is further stipulated that interest will be
assessed as provided by law on the deficiencies,
penalties, and additions to tax due from petitioners.

On January 27, 2004, the Court entered the stipulated decision. The stipulated decision reflected the amounts shown in the settlement stipulation.

On February 4, 2004, Montgomery called Tan on a different matter. During that conversation, she learned that he had settled petitioners' case in full. Tan then notified Ms. Keil that petitioners' case had been settled. On February 27, 2004, petitioners moved the Court to vacate the stipulated decision and to set aside the related stipulations of settlement. Petitioners asserted in their motion that this action should be taken because Montgomery was unauthorized to agree to the settlements on their behalf.

On March 16, 2004, the Court ordered Montgomery to file with the Court a statement as to his understanding of his authority to settle this case. Montgomery responded that he had been authorized by Mr. Keil to settle this case in accordance with the amounts shown in the stipulated decision, that petitioners had been clients of his for approximately 4 years, and that petitioners had previously allowed one of them to speak on behalf of (and bind) both of them. Montgomery also stated that on December 15, 2003, he had explained the second stipulation of settled issues to Mr. Keil and recommended its acceptance, Mr. Keil had authorized Montgomery on behalf of petitioners to accept the settlements reflected in that stipulation, and Mr. Keil had informed him that Mr. Keil would obtain Ms. Keil's acceptance of the settlements.

### OPINION

Petitioners argue that the Court should vacate the stipulated decision and set aside the related stipulations of settlement because Montgomery was not authorized to agree to the settlements on their behalf. Petitioners bear the burden of proving that Montgomery lacked the requisite settlement authority. See Dahl v. Commissioner, T.C. Memo. 1995-179, affd. 85 F.3d 643 (11th Cir. 1996). We presume that a duly licensed attorney appearing in this Court is authorized to act on behalf of a litigant whom the attorney purports to represent. Id.

However, as the United States Supreme Court has observed as to such a presumption:

> the utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed.
>
> A judgment entered upon such a compromise is subject to be set aside on the ground of the lack of authority in the attorney to make the compromise upon which the judgment rests. Prima facie, the act of the attorney in making such compromise and entering or permitting to be entered such judgment is valid, because it is assumed the attorney acted with special authority, but when it is proved he had none, the judgment will be vacated on that ground. Such judgment will be set aside upon application in the cause itself if made in due time or by a resort to a court of equity where relief may be properly granted. [United States v. Beebe, 180 U.S. 343, 352 (1901).]

Absent a stipulation to the contrary, an appeal of this case lies to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(A). That court has held that settlement agreements are contracts whose enforceability is governed by "familiar principles of contract law". Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989); see also Harrop v. W. Airlines, Inc., 550 F.2d 1143, 1145 (9th Cir. 1977). These "familiar principles" are drawn from the local law that applies to the general interpretation of contracts. Jeff D. v. Andrus, supra at 759. The applicable local law, California contract law, invokes the law of agency to determine whether Montgomery was authorized to settle all or part of petitioners' case, with the important caveat that only express authority from petitioners suffices to

confer the requisite settlement authority upon Montgomery. See

Levy v. Superior Court, 896 P.2d 171 (Cal. 1995); Blanton v.

Womancare, Inc., 696 P.2d 645, 649-653 (Cal. 1985); see also

Harrop v. W. Airlines, Inc., supra at 1145 ("an attorney has no

authority, either actual or implied, to settle an action without

the express permission of his client").[5]

Respondent argues primarily that Montgomery during his

December 15, 2003, telephone conversation with Mr. Keil received

express settlement authority. We disagree. Whether Montgomery

at that time obtained express authority to settle some or all of

petitioners' case is a question of fact. Adams v. Commissioner,

85 T.C. 359, 369-372 (1985). The facts at hand support a

conclusion contrary to that argued by respondent. Although

---

[5] We also note a recent observation by the U.S. Supreme
Court in Banks v. Commissioner, 543 U.S. ___, 125 S. Ct. 826
(2005). There, the Court stated:

> The relationship between client and attorney,
> regardless of the variations in particular compensation
> agreements or the amount of skill and effort the
> attorney contributes, is a quintessential
> principal-agent relationship. * * * The client may
> rely on the attorney's expertise and special skills to
> achieve a result the client could not achieve alone.
> That, however, is true of most principal-agent
> relationships, and it does not alter the fact that the
> client retains ultimate dominion and control over the
> underlying claim. The control is evident when it is
> noted that, although the attorney can make tactical
> decisions without consulting the client, the plaintiff
> still must determine whether to settle or proceed to
> judgment and make, as well, other critical decisions.
> [Id. at ___, 125 S.Ct. at 832-833.]

Montgomery testified that he believed that Mr. Keil during the telephone conversation of December 15, 2003, authorized him to settle this case on behalf of both petitioners, we find this testimony incredible when viewed against the record as a whole. Before that conversation, Montgomery had been dealing exclusively with Ms. Keil as to petitioners' 1993 and 1994 income taxes, and Montgomery had never spoken directly to Mr. Keil as to that matter.[6] Given our additional finding that the December 15, 2003, telephone conversation between Montgomery and Mr. Keil lasted 25 minutes at the most, we decline to find on the basis of Montgomery's uncorroborated and incredible testimony that Mr. Keil authorized Montgomery during their brief conversation to accept any settlement on behalf of both petitioners.[7] See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding on another ground T.C. Memo. 1957-129.

---

[6] While Montgomery testified in one breath that he met with both petitioners at the start of the audit and discussed the audit with them at that time, he testified adamantly in a second breath that he never had a face-to-face meeting with petitioners.

[7] Even if Montgomery had received Mr. Keil's consent on Dec. 15, 2003, as he claimed, that day was at least 1 day after Montgomery agreed to the second settlement and 6 days after he agreed to the first settlement. Of course, the mere fact that the parties filed the settlement stipulation with the Court on Jan. 14, 2004, does not mean that a settlement occurred only on that date. See Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320 (1997), affd. 208 F.3d 205 (3d Cir. 2000).

Such is especially so given our finding that Mr. Keil testified credibly that he never discussed the subject matter of the audit with Montgomery before December 15, 2003, that he never had a face-to-face meeting with Montgomery, and that he never authorized Montgomery to settle this "complex" case. Ms. Keil also testified credibly that she repeatedly informed Montgomery that she had to approve any settlement in this case, and Montgomery had for all practical purposes been retained by her to represent petitioners as to this matter. Even Montgomery testified that he always understood that he needed consent from both petitioners to settle their tax matters and that Ms. Keil never expressly agreed to settle the case.[8]

While Montgomery testified that he had established a relationship with both petitioners where the word of one was sufficient to bind both, we do not find that such was so. In addition to the fact that this testimony is inconsistent with the testimony just noted in the last sentence of the prior paragraph, the record does not persuade us that Ms. Keil ever allowed Mr. Keil to speak on behalf of her or to bind her to any agreement that he made on her behalf. Indeed, the fact that Montgomery repeatedly called Ms. Keil as to the settlements supports our contrary finding that he knew that he needed the approval of Ms.

_____

[8] We also note that Tan's testimony was consistent with the testimony of each petitioner and that Tan during the testimony of both petitioners was sequestered pursuant to Rule 145(a).

Keil for any settlement and that she was the spokesperson for petitioners.

We conclude on the basis of documentary evidence and the testimony of petitioners and Tan, witnesses whom we find to be more reliable than Montgomery, that at no time did either petitioner, by word or deed, authorize Montgomery to agree to either of the settlements.  Because we find that Montgomery acted without authority when he agreed to those settlements, and we do not find that petitioners ratified that action after the fact, we shall vacate the stipulated decision and set aside the related stipulations of settlement.[9]

We have considered all arguments made in this case and have rejected those arguments not discussed herein as without merit. Accordingly,

<u>An appropriate order will be issued</u>.

---

[9] We also note our disagreement with respondent's argument that petitioners cannot prevail as to their motion because they have not proven that vacating the decision will result in a lesser liability to them.  Suffice it to say that our conclusion that Montgomery was unauthorized to agree to the settlements on behalf of petitioners is sufficient under the facts herein to vacate the stipulated decision.  See <u>United States v. Beebe</u>, 180 U.S. 343, 352 (1901).